**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**CITY OF TACOMA, WASHINGTON,**
**Defendant–Appellant.**

No. 00–35070.

United States Court of Appeals,
Ninth Circuit.

Argued Oct. 16, 2001.

Submitted Feb. 4, 2003.

Filed June 4, 2003.

Kenneth G. Kieffer and Timothy L. Ashcraft, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, PLLC, Tacoma, WA, for the appellant.

John H. Stahr, Appellate Section, Environment and Natural Resources Division, Department of Justice, WA, D.C., for the appellee.

Before: FERGUSON, KLEINFELD, and GOULD, Circuit Judges.

Opinion by Judge GOULD; Dissent by Judge FERGUSON.

## OPINION

GOULD, Circuit Judge.

The United States brought this action, on behalf of itself and as trustee for the Skokomish Indian Tribe (the "Tribe") and its members, asking for declaratory judgment to invalidate the 1921 condemnation proceedings brought by the City of Tacoma ("Tacoma") and seeking to void land transfers made by the Tribe long thought by Tacoma to be settled. After cross motions for summary judgment, the District Court granted the United States' motion, invalidating the condemnation proceedings. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

# I

## A. Factual History

### 1. Funk Condemnation Proceedings

In 1920, Tacoma began plans to develop the Cushman hydroelectric power project on the North Fork of the Skokomish River.[1] To that end, Tacoma instituted condemnation proceedings in state court, entitled *Tacoma v. Funk*, No. 1615 (Wash.Super.Ct.), against private landowners with property in the area of the proposed project. The landowners included five tribal members who held allotted lands.[2] Three allotments were held in fee by the tribal members with a reversionary interest in the United States. Two were held in trust by the United States for tribal members' benefit. The United States was not a party in *Funk*.

On November 20, 1920, a bench trial was held on whether construction of the project was a public use. About a year later, the state court held that the project was a public use and that the condemnations were appropriate and necessary for the project. The state court ordered Tacoma to pay $1,411.61 in damages for portions of two allotments and perpetual easements across three. The court entered a conditional judgment on this order, subject to the United States government's approval, through its "proper authorities."

Thereafter, Percy P. Brush, Assistant City Attorney, contacted William B. Sams, Superintendent of the Taholah Indian School, about the condemnation. By letter of October 31, 1921, Brush told Sams of the proceedings and said that the clerk of the court in Shelton, Washington held the amounts required by the judgment, subject to the federal government's approval. Brush asked Sams to "take this matter up with the proper authorities and take such steps as are necessary towards protecting the government."

Sams responded, by letter of November 14, 1921, that the allotments "are each and all trust patented allotments, the title to the land remaining in the Government of the United States, and such lands are not subject to condemnation proceedings." On that day Sams also wrote the Commissioner of Indian Affairs at the Department of the Interior: "I have notified the Assistant Attorney of the City of Tacoma that condemnation proceedings against these trust patented lands will not lie; that the title yet remains in the Government of the United States and that their only method of securing the fee title to such lands is pursuant to the Act of June 25, 1910."

By letter of December 16, 1921, E.B. Meritt, Assistant Commissioner of Indian Affairs at the Department of the Interior, instructed Sams that condemnation of allotted lands for public purposes was authorized by Section 3 of the Act of March 3, 1901, 31 Stat. 1083–84 (codified at 25

---

**1.** The project includes two dams. Portions of the project are on the Skokomish Indian Reservation, including Powerhouse No. 2, at the north end of the reservation. Some transmission lines from Powerhouse No. 2 to Tacoma go across the five Skokomish allotments here at issue.

**2.** Communally held tribal land was allotted pursuant to a Congressional policy of assimilation that began in the 1880s and extended until 1928. *See* David H. Getches, *et al.*, *Federal Indian Law: Cases and Materials*, 190–91, 215 (3d ed.1993); *see also United States v. Arenas*, 158 F.2d 730, 733 (9th Cir. 1946). Congress implemented this policy through several allotment acts. *See* Getches, *supra*, at 190–98. Some portions of the Skokomish reservation were allotted under the Tribe's treaty (the Treaty of Point No Point), and other portions were allotted under the General Allotment Act of 1887, 25 U.S.C. §§ 331–34, 341–42, 348–49, 354, and 381, many sections of which have been subsequently repealed.

U.S.C. § 357). By letter of May 12, 1922, W.W. Mount, Assistant United States Attorney for the Western District of Washington, similarly advised Sams: "In view of [25 U.S.C. § 357,] I am inclined to believe that the procedure as adopted by the City in this condemnation suit is in all respects legal." Sams passed along Mount's letter to Meritt and said that the appraisement of the lands was "fully sufficient and fair and just to all concerned."

By letter of June 7, 1922, Meritt responded to Sams, approving the state court's conditional judgment and directing Sams to "present the original of this letter to the clerk of the court at Shelton, Washington, with request that the amount of the awards be turned over to you to be handled for the benefit of the Indians entitled." The letter was approved and signed by F.M. Goodwin, Assistant Secretary of the Department of the Interior. In July 1922, Sams complied with these directions, gave the letter to the clerk of the court, and asked that the funds be given to him for distribution.

### 2. Subsequent Proceedings and Events

The parties also point to several events that occurred between the 1921 *Funk* decision and the institution of this action in 1996.

### a. Agency Proceedings

In 1924, the Federal Power Commission ("FPC"), the predecessor of the Federal Energy Regulatory Commission ("FERC"), issued a 50–year "minor part" license, authorizing Tacoma to flood 8.8 acres of United States Forest Service land. *City of Tacoma*, 87 FERC ¶ 61,197 at 61,-732 n. 10, 1999 WL 323705 (1999). The FPC by order said that "the license will not interfere or be inconsistent with the purpose for which any reservation affected thereby was created or acquired."[3] *Id.* After 1974, the FERC issued an order extending the same right by granting Tacoma annual licenses for the next 24 years. In 1998, after this action started, the FERC issued an order granting Tacoma a 40–year license to continue operating the Cushman project. *City of Tacoma*, 84 FERC ¶ 61,107, 1998 WL 608611 (1998); *see City of Tacoma*, 86 FERC ¶ 61,311, 1999 WL 177637 (1999). The order recognized Tacoma's property interests in the five allotments, but acknowledged that this litigation would materially affect whether the lands were considered "reservations."[4] 84 FERC ¶ 61,107 at 61,547 & n. 55, 1998 WL 608611. In March 1999, the FERC issued an order on rehearing, finding that the five allotments fell within the FPA's definition of "reservations" based on the District Court's grant of summary judgment. 86 FERC ¶ 61,311, 1999 WL 177637 at 62,075.

### b. Skokomish Indian Tribe v. France

In an action against the State of Washington, Tacoma, and several corporations and individuals, the Tribe sought to quiet title on tidelands next to the reservation by the Hood Canal. *See Skokomish Indian Tribe v. France*, 320 F.2d 205, 206 (9th Cir.1963). The United States was not a party to the action.

---

**3.** In 1963, the FPC determined that its licensing authority encompassed the entire project. *See Pac. Gas & Elec.*, 29 F.P.C. 1265, 1266, 1963 WL 4558 (1963).

**4.** The Federal Power Act defines reservations as "national forests, tribal lands embraced within Indian reservations, military reservations, and other land and interests in lands owned by the United States, and withdrawn, reserved or withheld from private appropriation and disposal under the public land laws." 16 U.S.C. § 796(2).

The district court held that the Tribe's challenges to the FPC license were barred by laches and equitable estoppel. It held also that the action was a collateral attack barred by res judicata, that the issues should have been raised by the Tribe or the United States in the FPC hearings. We affirmed, holding that there was no clear error in the findings on which the District Court based its conclusions that the tidelands were not part of the reservation.

#### c. Tribal Resolution

In March 1977, the Skokomish Tribal Council passed a resolution on the *Funk* proceedings, to the effect that the state court lacked jurisdiction to condemn the property and that neither the United States nor the Tribe was a party in the action, as was required. The resolution asked the Commissioner of Indian Affairs to "undertake litigation and all other steps necessary to set aside or otherwise secure relief from the illegal condemnations."

### B. Procedural History

On May 1, 1996, the United States filed this federal court action, seeking for the Tribe a declaratory judgment that would invalidate the condemnation proceedings, and seeking damages for trespass. The district court bifurcated trial of liability and remedy. Cross motions for summary judgment on liability followed.

On November 20, 1998, the district court granted summary judgment to the United States and denied Tacoma's cross motion for summary judgment. The district court held that the United States had standing, that it was not equitably estopped, and that the condemnation proceedings were void because brought in state court and the United States was not a party.

After gaining summary judgment on liability, the United States declined to seek damages for trespass. On September 27, 1999, the United States filed a motion for entry of final judgment and to terminate discovery. Tacoma opposed, contending that discovery was needed to identify all parties bound by the judgment. The district court granted the motion and entered final judgment on December 14, 1999. Tacoma timely appealed on January 13, 2000.

### II

■ We review the grant of summary judgment de novo. *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1021 (9th Cir.2001) (citations omitted). We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied substantive law. *Id.* (citation omitted).

Tacoma contends: (1) that the United States lacks standing to bring this action and (2) that, notwithstanding the contentions of the United States and the Tribe, the *Funk* proceedings or the actions of the United States effectively conveyed property interests in the five allotments. We hold that the United States has standing to pursue this action, and that the United States did not convey its interest in the five allotments.

### A. Standing

■ Standing requires: (1) that the plaintiff suffered an injury in fact; (2) that there is "a causal connection between the injury and the conduct complained of"; and (3) that there is a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ The United States meets the first requirement. *See, e.g., United States*

*v. Hellard,* 322 U.S. 363, 366, 64 S.Ct. 985, 88 L.Ed. 1326 (1944) ("Restricted Indian land is property in which the United States has an interest."). The United States has suffered injury to its property rights in all the allotments, whether the United States' interest for the Tribe is fee simple or reversionary. *See Heckman v. United States,* 224 U.S. 413, 431, 437–47, 32 S.Ct. 424, 56 L.Ed. 820 (1912). The United States also suffered an injury as the trustee. *See Seminole Nation v. United States,* 316 U.S. 286, 296–97, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942). *See generally* 25 U.S.C. § 175. And the United States has an independent, governmental interest when it has not been made a party in condemnation proceedings of restricted Indian lands. *Hellard,* 322 U.S. at 368, 64 S.Ct. 985; *United States v. Candelaria,* 271 U.S. 432, 443–44, 46 S.Ct. 561, 70 L.Ed. 1023 (1926).

Tacoma argues that the United States cannot fulfill the causal connection requirement, urging that the alleged harm is not fairly traceable to Tacoma's actions because the federal officials' approval of the conditional judgment was an intervening cause of the alleged harm. But this ignores the fact that the initial and primary causes of the alleged injury were Tacoma's institution of the *Funk* proceedings and its failure to name the United States as a defendant. There remains "a fairly traceable connection between the plaintiff's injury an the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (citation omitted); *see Bowling v. United States,* 233 U.S. 528, 534, 34 S.Ct. 659, 58 L.Ed. 1080 (1914) ("the United States has capacity to sue for the purpose of setting aside conveyances of lands allotted to Indians under its care, where restrictions upon alienation have been transgressed.").

Tacoma also contends that the United States cannot meet the redressability requirement, because the United States has not proved that it, the Tribe, or the Tribe's members have a current interest in the five allotments. Thus, the argument runs, it is unclear how a declaratory judgment can redress the alleged wrong. However, we conclude that the alleged injury would be redressed through the cancellation of the state judgment and the setting aside of the conveyances. Although it may be not yet known precisely which individuals or entities would benefit from such relief, the United States would benefit as land owner and trustee. Thus, Tacoma's redressability argument fails. We hold that the United States has standing to proceed in this action.

## B. Validity of the Conveyances

Condemnations of allotted lands for public purposes are governed by 25 U.S.C. § 357, which provides:

> Lands allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee.

While § 357 appears to give a broad power of condemnation to Tacoma, the Supreme Court has interpreted the provision narrowly. In *Minnesota v. United States,* 305 U.S. 382, 386, 59 S.Ct. 292, 83 L.Ed. 235 (1939), the Supreme Court held that, under § 357, "[t]he United States is an indispensable party defendant to ... condemnation proceedings [regarding trust allotments]. A proceeding against property in which the United States has an interest is a suit against the United States." (citations omitted). Holding that the state court in which the suit was initially brought lacked jurisdiction, the Court not-

ed that § 357 "contains no permission to sue in the court of a state." *Id.* at 389, 59 S.Ct. 292. The Court further explained that "[t]here are persuasive reasons why [§ 357] should not be construed as authorizing a suit in a state court" and that "[t]he judicial determination of controversies concerning such lands has been commonly committed exclusively to federal courts." *Id.* (footnote omitted); *see also United States v. United States Fid. & Guar. Co.*, 309 U.S. 506, 512–14, 60 S.Ct. 653, 84 L.Ed. 894 (1940) (holding that a Missouri court acted without jurisdiction and that its judgment, purporting to adjudicate a cross-claim against the United States and a federally recognized Indian tribe without a waiver of sovereign immunity, was void).

◼ *Minnesota* is particularly relevant, because two of the allotments that Tacoma purported to condemn were held in trust by the United States, as were the allotments in *Minnesota;* the remaining three, although held in fee by individual Indians, were subject to restraints on alienation and reversionary interests in the United States. It has long been settled that those two types of allotments are to be treated identically as to Congressional control and limitations on alienability. *See United States v. Ramsey*, 271 U.S. 467, 470–71, 46 S.Ct. 559, 70 L.Ed. 1039 (1926). Moreover, *Minnesota*'s holding regarding trust allotments expressly relied on earlier holdings regarding allotments in which the United States held a reversionary interest. *Minnesota*, 305 U.S. at 386 n. 1, 59 S.Ct. 292. As indicated in *Minnesota*, those earlier holdings were similarly strict in their requirement that the United States be joined in any court proceedings adjudicating the rights to allotted land:

> In the case of patents in fee with restraints on alienation it is established that an alienation of the Indian's interest in the lands by judicial decision in a suit

to which the United States is not a party has no binding effect but that the United States may sue to cancel the judgment and set aside the conveyance made pursuant thereto.

*Id.* (citing *Sunderland v. United States*, 266 U.S. 226, 45 S.Ct. 64, 69 L.Ed. 259 (1924); *Privett v. United States*, 256 U.S. 201, 41 S.Ct. 455, 65 L.Ed. 889 (1921); *Bowling & Miami Inv. Co. v. United States*, 233 U.S. 528, 34 S.Ct. 659, 58 L.Ed. 1080 (1914)).

Although *Minnesota* was issued after the 1921 condemnation proceedings, it interpreted a statute that came into effect in 1901, two decades before the condemnation proceedings. *Minnesota*'s interpretation of § 357 is thus properly considered to be binding as to all attempted condemnations of allotted lands governed by § 357, regardless of whether the condemnation proceedings predate or postdate the decision in *Minnesota:*

> When [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given *full retroactive effect* in all cases still open on direct review and *as to all events, regardless of whether such events predate or postdate* [*the* ] *announcement of the rule.*

*Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (emphasis added).

◼ Moreover, the Supreme Court's interpretation of 25 U.S.C. § 357 in *Minnesota* cannot be considered a "change" of operative law. The theory of a judicial interpretation of a statute is that the interpretation gives the meaning of the statute from its inception, and does not merely give an interpretation to be used from the date of the decision. *Rivers v. Roadway Express*, 511 U.S. 298, 114 S.Ct. 1510, 128

L.Ed.2d 274 (1994). As was explained by the Supreme Court in *Rivers,* "[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Id.* at 312–313, 114 S.Ct. 1510. In a footnote attached to the above statement of rule, the Court elaborated:

> when this Court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law. In statutory cases the Court has no authority to depart from the congressional command setting the effective date of a law that it has enacted.

*Id.* at 313 n. 12, 114 S.Ct. 1510.[5]

■ In sum, *Minnesota* and its authoritative construction of section 357 control. The superior court in *Funk* lacked jurisdiction to condemn the five Indian allotments in which the United States continued to hold a valid property interest, and the proceedings are therefore void. No subsequent approval or ratification by federal officials could remedy the underlying jurisdictional problem, *United States Fid. & Guar. Co.,* 309 U.S. at 513, 60 S.Ct. 653, and the federal officials who purported to ratify the court's decision lacked the authority independently to alienate the allotments. *See United States v. Clarke,* 445 U.S. 253, 254, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980) (holding that "only in ... a formal judicial proceeding may [allotted] lands such as this be acquired" by a city or state for public use). Under settled law, we must affirm the correct decision of the district court and conclude that the 1921 condemnation proceedings were without effect and conveyed no interest to Tacoma.

■ Here, there can be no argument that equitable estoppel bars the United States' action because, when the government acts as trustee for an Indian tribe, it is not at all subject to that defense. *See, e.g., United States v. Ahtanum Irrigation Dist.,* 236 F.2d 321, 334 (9th Cir.1956); *see also Cramer v. United States,* 261 U.S. 219, 234, 43 S.Ct. 342, 67 L.Ed. 622 (1923) (holding that, in suit by United States to set aside a land patent of Indian-occupied land granted to a non-Indian, the government could not be estopped from bringing the suit on behalf of the Indians in possession by earlier, unlawful "act[s] or declaration[s]" of its officers or agents"); *Cato v.*

---

5. The dissent incorrectly relies on a dictum in *United States v. Estate of Donnelly,* 397 U.S. 286, 90 S.Ct. 1033, 25 L.Ed.2d 312 (1970), to argue that *Minnesota* cannot be applied retroactively here, on the theory advanced by Tacoma that it "justifiably relied" on the federal authorities' statements that the transfers were permissible. In *Donnelly,* the government filed but did not enforce a tax lien against Donnelly's property, using a procedure that had been deemed impermissible under the Sixth Circuit's interpretation of the relevant federal statute. Seventeen years after the Sixth Circuit decision, and one year after Donnelly sold the property, the Supreme Court rejected the Sixth Circuit's view in an unrelated case. The government then sought to enforce the lien against the purchaser of Donnelly's property. In *Donnelly,* the Supreme Court held that its interpretation of the statute applied retroactively, and that there was no "justified reliance" on the Sixth Circuit's view by the purchaser of the property. *Id.* at 295, 90 S.Ct. 1033. The Court said that the Sixth Circuit's ruling did not provide the "justified reliance" necessary to bar the retroactive application of the Supreme Court's interpretation of the statute. The Court added, "In rare cases, decisions construing federal statutes *might* be denied full retroactive effect, *as for instance where this Court overrules its own construction of a statute* ... but this is not such a case." *Id.* (emphasis added) (citation omitted). Similarly, the case before us is not such a case and, as in *Donnelly,* the justifiable reliance theory should be rejected and the general rule followed to apply statutory interpretation to events predating the interpretation.

*United States*, 70 F.3d 1103, 1108 (9th Cir.1995) (noting "the well-established rule that a suit by the United States as trustee on behalf of an Indian tribe is not subject to state delay-based defenses").

### III

Because we are bound by *Minnesota*, we hold that the conveyances of the five allotments were invalid. We affirm summary judgment to the United States.

**AFFIRMED.**

FERGUSON, Circuit Judge, dissenting.

I must respectfully dissent. Although I agree with the majority that, as a general rule, we regard a judicial interpretation of a statute as an "authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction," *Rivers v. Roadway Express*, 511 U.S. 298, 312–13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994), I believe the instant case presents exactly the kind of "rare case" which the Court in *United States v. Estate of Donnelly* recognized might be exempted from the full retroactive effect of a decision construing a statute. *See United States v. Donnelly*, 397 U.S. 286, 295, 90 S.Ct. 1033, 25 L.Ed.2d 312 (1970). I would hold that in cases such as the instant one, in which the decision to be retroactively applied announced a "new" interpretation of the statute, and in which both compelling equitable considerations as well as principles of finality weigh against retroactive application of the decision, the general rule must give way to "familiar considerations of fair notice, reasonable reliance, and settled expectations." *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

As an initial matter, I do not find the language from *Rivers* which the majority quotes to be binding in this case. While the majority cites *Rivers* for the general proposition that judicial interpretations of statutes are generally retroactively applied to the date of enactment, the most succinct and squarely controlling articulation of this principle was announced in *United States v. Donnelly*, the case which I believe, as I discuss below, should control our analysis. Although *Donnelly* held that "[a]cts of Congress are *generally* to be applied uniformly throughout the country from the date of their effectiveness onward," *Donnelly*, 397 U.S. at 294, 90 S.Ct. 1033 (emphasis added), it also stated that certain kinds of "justified reliance" could "warrant withholding retroactive application of a decision construing a statute as Congress intended it." *Id.* at 295, 90 S.Ct. 1033. Thus, *Donnelly* dealt squarely with precisely the issue that we currently confront.

By contrast, the language from *Rivers* that the majority relies upon was written in response to an entirely different legal question than the one presented here. In *Rivers*, the court was grappling with the "sole question whether [a 1991 Act altering a rule of law established in a Supreme Court case interpreting the Civil Rights Act] applies to cases pending when it was enacted." 511 U.S. at 303, 114 S.Ct. 1510. In response to this question, the *Rivers* court held that "when Congress intends to supersede a rule of law embodied in one of our decisions ... its intent to reach conduct preceding the 'corrective' amendment must clearly appear." *Id.* at 313, 114 S.Ct. 1510. While the Court noted its belief that "when this Court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law," *id.* at 313 n. 12, 114 S.Ct. 1510, it did not squarely address the issue of the appropriate scope of retroactive application of its own decisions interpreting statutes, nor did it preclude the

possibility of a limiting principle to the general rule.[1]

While we generally give "due deference" to Supreme Court dicta, *see United States v. Baird,* 85 F.3d 450, 453 (9th Cir.1996), such deference cannot and should not be unlimited. *See Batjac Productions Inc. v. GoodTimes Home Video Corp.,* 160 F.3d 1223, 1232 (9th Cir.1998) (citing *United States v. Crawley,* 837 F.2d 291, 292–93 (7th Cir.1988) as "noting reasons for rejecting dicta, such as (1) unnecessary to the outcome of the case; (2) can be deleted without affecting the argument; (3) not grounded in the facts of the case; (4) issue addressed was not present as an issue in the case."). In particular, dicta should not be controlling when there is another case more squarely on point. *See Humphrey's Ex'r v. United States,* 295 U.S. 602, 627, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (" 'general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.' "). Assuming that the broad *Rivers* language is what it appears to be—dicta—it should not trump the significant equitable and finality concerns at play in this case.

In a case subsequent to *Rivers,* the Court also announced that, in general, "[n]ew legal principles, even when applied retroactively, do not apply to cases already closed," particularly cases that present "special finality-related concerns." *Reynoldsville Casket Co. v. Hyde,* 514 U.S. 749,

758, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995). *Reynoldsville Casket* also recognized certain principles that might limit retroactive application of a new rule even in cases which were pending when the novel decision was issued. *See Reynoldsville Casket,* 514 U.S. at 759, 115 S.Ct. 1745. I believe these same principles are applicable in this case, in particular general principles of equity "reflect[ing] *both* reliance interests and other significant policy justifications," and "principle[s] of law, such as that of 'finality' . . . that limit[ ] the principle of retroactivity itself." *Id.* at 759, 115 S.Ct. 1745. For all of these reasons, *Donnelly,* and not *Rivers,* should control in this case.

Under *Donnelly,* the Court's decision in *Minnesota v. United States,* 305 U.S. 382, 386, 59 S.Ct. 292, 83 L.Ed. 235 (1939), should not be retroactively applied to the parties in this case. Although the Supreme Court has never clearly set out a limiting principle to retroactive judicial statutory interpretation, I believe that the decisions in *Donnelly* and *Reynoldsville Casket* provide us with ample guidance. In particular, I believe that the presence of the following factors prohibits full retroactive application of the decision in *Minnesota* in this case: (1) the presence of a novel decision regarding the statute, such that the City of Tacoma can claim "justifiable reliance" on its earlier interpretation of the statute; (2) the fact that the government did not adhere to the statutory construction it now seeks to rely upon at the time of the underlying proceedings; (3) the fact that the underlying proceedings,

---

**1.** The portion of *Rivers* which the majority relies upon, which cites no support or authority for its reasoning, seems a particularly fragile foundation upon which to rest, given the counterbalancing fairness concerns which the City of Tacoma raises. Indeed, if we were to take the quoted *Rivers* language on its face, as the majority appears to do, it would raise

enormous *ex post facto* problems in the criminal context. The Supreme Court has made it abundantly clear that retroactive application of a novel judicial interpretation of a criminal statute is prohibited. *See Rogers v. Tennessee,* 532 U.S. 451, 457, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001).

when viewed in their entirety, comply with the spirit and the purposes of the rule announced in *Minnesota* as well as all but one of the elements required to give a proceeding *res judicata* effect; (4) the serious finality concerns raised by vacating a proceeding upon which the parties have relied for over eighty years, and which the government did not seek to challenge until nearly sixty years after the intervening statutory decision; and (5) the fact that no injustice or actual prejudice is alleged to have resulted from the underlying action.

First, unlike the plaintiffs in *Donnelly*, the City of Tacoma faced the task of interpreting a vague statute that provided no guidance as to how to proceed with public-use condemnation of Tribal lands. *Cf. Donnelly*, 397 U.S. at 293, 90 S.Ct. 1033.[2] In other words, the City of Tacoma faces the retroactive application of, for all practical purposes, a new rule of law, at least as measured by the position it was in in 1921. *See Chevron Oil Co. v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (A new rule of law is created when a court "overrul[es] clear past precedent on which litigants may have relied, or [decides] an issue of first impression whose resolution was not clearly foreshadowed.") (citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 496, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and *Allen v. State Bd. of Elections*, 393 U.S. 544, 572, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969)). At the time of the *Funk* proceedings, the *Minnesota* decision was not such a foregone conclusion that the City of Tacoma was unreasonable in believing that it was permissible to enter only a conditional judgment that

was explicitly subject to the approval of the United States. *See Allen*, 393 U.S. at 572, 89 S.Ct. 817 (resolution of a case not clearly foreshadowed when resolution of the issues is "subject to rational disagreement."); *see also Hanover Shoe*, 392 U.S. at 499, 88 S.Ct. 2224. The "clear language" of § 357 provided no guidance as to how a state should proceed when condemning reserved land, merely stating that a state was permitted to condemn lands allotted in severalty to Indians. *See* 25 U.S.C. § 357; *cf. Donnelly*, 397 U.S. at 293, 90 S.Ct. 1033.

Contrary to the majority's assertion, the Supreme Court cases preceding *Minnesota* provided no more guidance to the City of Tacoma than the statute. In *Bowling & Miami Inv. Co. v. United States*, 233 U.S. 528, 534, 34 S.Ct. 659, 58 L.Ed. 1080 (1914), the Court focused on the scope of the United State's authority regarding allotted land, holding that "the United States has capacity to sue for the purpose of setting aside conveyances of lands allotted to Indians under its care, where restrictions upon alienation have been transgressed ... [as well as the complementary] authority to enforce [such] restrictions." The Court did not hold that the United States must be named as a party in any action, instead reasoning that "[t]he authority of the United States to enforce the restraint ... cannot be impaired by any action *without its consent.*" 233 U.S. at 535, 34 S.Ct. 659 (emphasis added). *Privett v. United States* merely reiterated the language in *Bowling*, focusing on the need of the United States to protect its own interest

---

**2.** The *Donnelly* court noted that the decision to be retroactively applied in that case, its opinion in *United States v. Union Central Life Ins. Co.*, 368 U.S. 291, 82 S.Ct. 349, 7 L.Ed.2d 294 (1961), "merely construed [statute], in accordance with the clear language of the statute, ... [consistently with] courts and oth-

er authority who had considered the question, ... [and] in accordance with the will of Congress as expressed in ... [an amendment to the statute] and the accompanying legislative history." *Donnelly*, 397 U.S. at 293, 90 S.Ct. 1033.

in the land at issue in that case, but not even suggesting an absolute requirement that the United States be made a party to any action involving Indian land. *See* 256 U.S. 201, 204, 41 S.Ct. 455, 65 L.Ed. 889 (1921). In short, the City of Tacoma was entirely reasonable in believing that by securing the United States' consent to the condemnation proceeding, they had complied with any implied requirements in § 357. *Cf. Donnelly,* 397 U.S. at 293, 90 S.Ct. 1033.

Second, unlike the United States in *Donnelly,* the government in this case did not "adhere" to what it *now* believes "to be the correct interpretation of the statute" at the time of the underlying condemnation proceeding, thus it cannot now claim that it should "reap the benefits of that adherence." *See id.* 397 U.S. at 294. Quite to the contrary, in this case the United States reviewed and consented to the proceedings, and made no effort, even after *Minnesota* was decided, to seek review or contest the proceedings. *Cf. Donnelly,* 397 U.S. 292–94, 90 S.Ct. 1033.

The 1921 conditional judgment explicitly required the "approval of the proper authorities of the United States Government." While Sams, the Superintendent of the Indian School on the reservation to whom the City of Tacoma initially addressed its notice, initially expressed concerns regarding the validity of the condemnation proceedings, over the course of the next nine months and after research by the Assistant United States Attorney and investigations by Sams acting on behalf of officials at the Department of the

Interior, all of the officials—including Sams, the Assistant United States Attorney, the Assistant Commissioner of Indian Affairs, and the Assistant Secretary of the Department of the Interior—agreed to consent to the condemnation and approve the judgment. In sum, the United States fully explored its options and exercised complete control over the case for almost a year.

In viewing these facts, it is clear that the United States was given more power than it would have had as a party in any court, including the court itself. It was given the absolute power to unabashedly protect its own interests and the interests of the Skokomish Indian Tribe, adjudicate its own claims, and approve or disapprove of the judgment. Moreover, the proper government officials at the Department of Justice and the Department of Interior exercised these powers and reached the conclusion that the conveyances were valid and should be approved. Under the law as it stood at the time the condemnation judgment was finalized, the City of Tacoma and the state court were entirely reasonable in believing they had complied with both the letter and the spirit of § 357. In short, the purpose of the Supreme Court's holding in *Minnesota* has been fulfilled by the particular circumstances set forth in this case.[3]

It is simply indefensible to suggest that the City of Tacoma, through no fault of its own, must bear the burden of the United States' failure to adequately protect either its own interests or the interests of the

---

**3.** If nothing else, equity requires that caselaw not be applied without considering the purpose and goals of the laws that are being interpreted. *Bd. of Com'rs v. United States,* 308 U.S. 343, 350, 60 S.Ct. 285, 84 L.Ed. 313 (1939) ("Instead of choosing a rigid rule, the Court has drawn upon those flexible considerations of equity which are established sources

for judicial law-making."); *see United States v. Peck,* 102 U.S. 64, 66, 26 L.Ed. 46 (1880) (applying fundamental principles of equity against the government as a party to a contract); *cf. Omaha Indian Tribe v. Jackson,* 854 F.2d 1089, 1095 (8th Cir.1988) (applying principles of equity in a quiet title action).

Tribe. We have previously recognized that mismanagement of Indian lands

cannot to be said to be out of character with the sort of thing which Congress and the Department of the Interior has been doing throughout the said [stet.] history of the Government's dealings with the Indians ... [a] history [which] largely supports the statement: 'From the very beginnings of this nation, the chief issue around which federal Indian policy has revolved has been, not how to assimilate the Indian nations whose lands we usurped, but how best to transfer Indian lands and resources to non-Indians'.

*United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 337 (9th Cir.1956) (quoting Dorothy Van de Mark, *The Raid on the Reservations,* Harper's Magazine, Mar. 1956). Nevertheless, "[t]he Secretary [of the Interior's] mistakes, his poor judgment, his overlooking or ignoring of the true measure of the Indian's rights, his lack of bargaining skill or determination may add up to an abuse of his power, but do not negative it, or make his act ultra vires." *Id.* at 338. While it is arguable that the United States breached its fiduciary duty to the Tribe by failing to protect the Tribe's interests in the *Funk* proceedings, we cannot rewrite history to pretend its actions did not have legal consequence when it is clear that they did.

The historical fiction in which the majority indulges is particular problematic in the context of the case in which the underlying proceedings occurred nearly a century ago. While the United States may not be formally bound by the doctrine of *res judicata* because it was not made a party in *Funk,* unlike the transaction in *Donnelly,* the *Funk* proceedings have now "acquired such a degree of finality that the rights of the parties should be considered frozen." *Donnelly,* 397 U.S. at 296, 90

S.Ct. 1033 (Harlan, J., concurring). The majority's application of *Rivers* to the facts of this case raises very significant finality concerns, as apparently all proceedings that the United States otherwise validated that preceded the *Minnesota* decision will now be vacated, despite the fact that all of the parties involved have relied on the resolution of these issues for over eighty years.

Finally, the fact the United States does not allege that any injustice or unfairness resulted from the *Funk* proceedings further supports rejecting the retroactive application of *Minnesota.* The United States does not contend that the Tribe did not receive a fair award for the land, or that the proceedings were in any other way untoward or inequitable. Thus, it is not clear what purpose the declaratory relief the government requests serves, except to allow it to renegotiate a transaction which it had every opportunity to negotiate years ago. While at one point the United States asserts that a holding against it would "prevent [it] from meeting [its trust responsibility to the tribes and individual Indians and] harm the public interest," it seems to me that the United States has no one but itself to blame if its own officials fail to exercise their trust responsibilities faithfully and diligently.

In this case, we have a judicial interpretation of a statute that essentially operates as a new rule of law. In addition, we have a municipality that made every reasonable effort to comply with the law as it stood at the time of the *Funk* proceeding. Most importantly, the condemnation process, when viewed in its entirety, complied with the purpose and goals, if not the letter, of *Minnesota*'s holding. Finally, we have proceedings which no one now asserts resulted in unfairness or inequity, and which remained unchallenged for decades, despite the government's full knowledge of

both the effect of those proceedings and the intervening decision interpreting the statute.[4] In light of these facts, we should impose the burden of the United States' failure to protect its own or the Tribe's interests on the United States, not the City of Tacoma.

I am not unsympathetic to the members of the Tribe whose interests may have been disadvantaged because of the United States' disgraceful mismanagement, indifference, and inaction. Nevertheless, the majority's form over substance approach shifts the burden of the United States' failure to act as a diligent trustee onto a state municipality that did everything in its power to ensure that the United States had an opportunity to validate the land transfer that underlies the instant case. Because I do not believe that either the Supreme Court's statutory retroactivity jurisprudence or fundamental principles of equity countenance such a result, I dissent.

---

4. Indeed, the Tribe specifically requested that the government intervene on its behalf in 1977, yet the government still waited nearly twenty years before taking action.