**MT. ST. HELENS MINING AND RECOVERY LIMITED PARTNERSHIP, Plaintiff–Appellant,**

v.

**UNITED STATES of America; Dan Glickman, in his capacity as Secretary of Agriculture; Mike Dombeck, in his capacity as Chief of the Forest Ser-**

---

vice; Nancy Graybeal, in her capacity as Acting Regional Forester, U.S. Forest Service; Claire Lavendel, in her capacity as Supervisor, Gifford–Pinchot National Forest, Defendants–Appellees.

No. 03–35498.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 2004.

Filed Sept. 3, 2004.

Robert P. Hailey, Esq., Spokane, WA, for the appellant.

Peter Angus Winn, Assistant United States Attorney, Seattle, WA, for the appellees.

Before: BRUNETTI, McKEOWN, and GOULD, Circuit Judges.

BRUNETTI, Circuit Judge:

Appellant, Mount St. Helens Mining and Recovery Limited Partnership (the "Partnership"), filed the underlying suit against Appellees, the United States of America (the "Government"), Dan Glickman, Secretary of the Department of Agriculture (the "Department"), Mike Dombeck, Chief of the Forest Service, Nancy Graybeal, Acting Regional Forester and Claire Lavendel, Supervisor, Gifford–Pinchot National Forest (the "Forest Service"), alleging that the Department violated the Mount St. Helens National Volcanic Monument Act and the Mount St. Helens National Volcanic Monument Completion Act by failing to timely acquire the Partnership's patented mineral interests located within the Mount St. Helens Monument.

After the Partnership filed suit to compel the Department of Agriculture to acquire the Partnership's mineral interests, the Department and the Forest Service offered to exchange land outside the Monument's boundaries valued at $242,000 for the mineral interest owned by the Partnership. The Partnership rejected this offer and Appellees filed a motion for summary

judgment. The district court granted the motion, concluding that the Department's offer was not arbitrary, capricious, or contrary to law. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTS AND PROCEEDINGS BELOW

### A. *The Mount St. Helens National Volcanic Monument Act*

Following the eruption of Mount St. Helens in 1980, Congress passed "An Act to Designate the Mount St. Helens National Volcanic Monument (the "Monument") in the State of Washington, and For Other Purposes," Pub.L. No. 97–243, 96 Stat. 301, 16 U.S.C. § 431 note (August 26, 1982) (the "Monument Act"). The Monument Act was passed to protect the ecosystem created by the eruption. It provides in pertinent part:

> Sec 3.(a) The Secretary [of Agriculture] shall acquire all lands and interests in lands within the boundaries of the Monument by donation, exchange ..., or purchase with donated or appropriated funds ... except that the Secretary may acquire mineral and geothermal interests only by exchange. It is the sense of the Congress that in the case of mineral and geothermal interests such exchanges should be completed within one year after the date of enactment of this Act.

Pub.L. No. 97–243, 96 Stat. 301.

In 1998, Congress, concerned with the lack of progress in acquisitions, passed "An Act to Provide for the Expeditious Completion of the Acquisition of Private Mineral Interests Within the Mount St. Helens National Volcanic Monument" (the "Completion Act"). *See* Pub.L. No. 105–279, 112 Stat. 2690, 16 U.S.C. § 431 note (Oct. 23, 1998). The Completion Act expressed Congress's intent that the Forest Service continue to expeditiously acquire private property within the Monument area. More than twenty years after the Monument Act was enacted, however, the Department of Agriculture has still not acquired the Partnership's mineral interests located within the Monument.

### B. *The Partnership's Mineral Interests*

The Partnership is the owner of patented mineral interests on about 604 acres of land located within the boundaries of the Monument. The Partnership's interests can best be described as consisting of three irregularly shaped tracts within the Spirit Lake region of the Monument: (1) the Norway–Sweden Group (about 468 acres), (2) the United Group (about 99 acres) and (3) the Chicago Discovery Group (about 37 acres).

The Norway–Sweden Group is located at the head of Spirit Lake. No commercial mineral deposit has ever been discovered in this area. In 1943, the Bureau of Mines performed engineering studies of the area, but determined the copper deposits were too small and of too low grade to develop. After the 1980 eruption, 16% of this area is under water and most of the remainder is covered with blown down timber, ash, and debris.

The United Group is located on the east side of a ridge that separates Spirit Lake and the Green River drainage. Natural vegetation has returned to this area after the eruption and guided walks are led on the land. This area is the focus of the largest valuation dispute between the parties' geological experts. The Partnership's geologists assert that the United Group has the most potential for exploration, while the Forest Service's geologists contend that this area has no potential for exploration and economic development.

The Discovery Group lies north of the United Group on steep terrain. All geologists agree that this area has the least

mineral potential of any of the patented mineral interests.

## C. *The Underlying Action*

In 1999, the Partnership filed suit against Appellees, seeking *inter alia,* an order of mandamus, pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), to compel Appellees to complete the acquisition of the Partnership's patented mining interests within the Monument's boundaries. The Partnership demanded that the Department and the Forest Service base its valuation of the Partnership's patented mineral interests—for purposes of acquisition—in part on a geological report prepared by J.A. Empsall. In that report, Empsall estimated that the patented mineral interests had a "gross value for exchange purposes of $321 million in 1983 dollars." Empsall's report prompted Forest Service geologists John Simmons and Ruth Seeger to independently conduct examinations of the Partnership's patented mineral interests. Both Simmons's report and Seeger's report disputed Empsall's conclusions, asserting that Empsall never addressed the issue of whether any of the patented mineral interests could be economically mined. Each concluded that it would cost more to mine and process the copper than it could ever be sold for on the market. Both Simmons and Seeger concluded that the patented mineral interests were speculative claims of nominal value.

The Forest Service then retained two outside geologists, John Balla and Anthony Payne, to study the land. In numerous independent reports, Balla and Payne concurred with the conclusions of Simmons and Seeger that the patented mineral interests of the Partnership were speculative with only nominal value. The Forest Service also requested the advice of Ray Lasmanis, the chief geologist for the State of Washington. Lasmanis, working without compensation, concluded that the patented mineral interests could not be economically developed.

To refute the Forest Service's experts, the Partnership retained Stanley Keith and Jan Rasmussen of MagnaChem, Inc., who specialize in a methodology of mineral computer modeling known as "pluton vectoring analysis." After analyzing rock samples taken from mineral deposits at the United Group, Keith and Rasmussen concluded that there might exist copper deposits to the east of the United Group worth as much as $13 billion dollars.

The Forest Service's outside geologists, Payne and Balla, independently reviewed Keith and Rasmussen's report and each determined that Keith and Rasmussen's work was inconsistent with accepted methodologies used by commercial mining companies for predicting the likelihood of copper deposits. Balla also noted that even if Keith and Rasmussen's report was correct, the Partnership would not own the potentially valuable copper deposits because they were to the east of the United Group.

In September 2001, the Forest Service hired Gerald Halmbacher, a licensed land appraiser with experience in appraising mineral interests, to prepare a valuation of the patented mineral interests based on comparative market values. Halmbacher retained his own consulting geologist, David Wahl, to review the work of the two groups of battling experts. Wahl, just like Balla, noted that any copper deposit predicted by Keith and Rasmussen would not be within the patented mineral interests owned by the Partnership, that their analysis failed to take into account the cost of mining and recovery, and that the only known scattered copper deposit in the area of Mount St. Helens has never been commercially developed and was ultimately sold at a great loss. Wahl concluded:

Although minor amounts of metals have been produced from Partnership claims in the distant past, the claims have received but little exploration/ development attention since the late 1920's and effectively have been inactive since the eruption of Mount St. Helens in 1980. While the claims contain mineral occurrences, potential for development of commercially economic metal deposits is very low. The mineral occurrences present within Partnership claim blocks have been evaluated in past times when commercial exploitation of such occurrences was much more feasible than it is today. Further efforts to develop these mineral occurrences are not justified. It is possible that portions of the claims may have minor value for recreational prospecting and hobbyist mining.

On December 2, 2002, Halmbacher completed his valuation of the Partnership's patented mineral interests. He reviewed the reports of all of the geologists, including the geologist he hired, and examined sales of similar properties around the country. Halmbacher determined that the patented mineral interests were properly valued at $200 per acre, resulting in a total valuation of $121,000. In his appraisal, Halmbacher noted that there was a recent sale of interests in a group of patented claims immediately to the east of the United Group that "could provide an important indication of the value of the subject [property]." After reviewing the market sale of the recently sold property to the east of the United Group, Halmbacher doubled his estimated value of the Partnership's patented mineral interests to $242,000.

The Forest Service approved Halmbacher's supplemental appraisal and provided the Partnership with an opportunity to review and comment on the new figure. The Partnership argued that (1) Halmbacher did not possess the qualifications to determine the value of the land, (2) the value of the land should be determined based on the value prior to the Monument Act's passage, and (3) the comparative lands Halmbacher based his valuation on were not analyzed as thoroughly as was the land at issue in this valuation. The Forest Service responded (1) with Halmbacher's credentials, (2) that pursuant to the Uniform Appraisal Standards for Federal Land Acquisitions, the land must be appraised to estimate the value of the property as of the current value, and (3) Halmbacher looked at numerous appropriate properties to determine the value of this property.

D. *The Forest Service's Agency Action*

On January 16, 2003, the Forest Service accepted the appraiser's valuation and offered, pursuant to the Monument Act, to exchange the Partnership's interest for various other properties valued at $242,000. The Forest Service was firm on the need for the Partnership to accept the appraised value of the patented mineral interests before the process could go forward. The Forest Service notified the Partnership of this final agency action by writing:

Given the expense and time required for a land exchange, the Forest Service cannot initiate the exchange process until it receives written agreement to accept the Forest Service's offer based on the valuation stated above. If [the Partnership] does not agree to this offer and sign an Agreement to Initiate the exchange based on this offer, then the Forest Service cannot continue to pursue a land exchange with [the Partnership]. This offer constitute final agency action.

The Partnership refused to accept the appraisal of the interests. Appellees then filed a motion for summary judgment. The Partnership opposed the motion, argu-

ing that the valuation of the Forest Service was "arbitrary and capricious" and that the district court should conduct a trial on the merits.

The district court reviewed the Forest Service's valuation under the "arbitrary and capricious" standard of review of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. The court concluded that the appraiser had considered all the geological reports in making his determination, that there was nothing in the record to suggest that the appraiser was unqualified for the job, and that the agency's decision was not "arbitrary and capricious." Summary judgment was granted and the Partnership filed a timely notice of appeal.

## ANALYSIS

### A. *Standard of Review*

We review a district court's grant of summary judgment de novo. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir.2003). "Our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c)." *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1064 (9th Cir.2002) (en banc), *cert. denied*, 538 U.S. 922, 123 S.Ct. 1573, 155 L.Ed.2d 313 (2003). "We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *City of Tacoma*, 332 F.3d at 578.

### B. *The Arbitrary and Capricious Standard*

The Partnership first attacks the district court's grant of summary judgment by arguing that the district court erred in reviewing the Forest Service's agency action under the "arbitrary and capricious" standard of review as prescribed by the APA. 5 U.S.C. § 706(2). This argument is unpersuasive.

■ 5 U.S.C. § 706 provides in pertinent part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]

It is well established that once an agency has taken final agency action under the APA, a reviewing court analyzes that decision under the "arbitrary and capricious" standard of review. *Wileman Bros. & Elliott, Inc. v. Espy*, 58 F.3d 1367, 1374 (9th Cir.1995); *Reppy v. Dep't of Interior*, 874 F.2d 728, 731 (10th Cir.1989) (holding that a court does "not reverse an act of an agency within the sphere of its statutory authority unless it is arbitrary, capricious, or an abuse of discretion ..."). Here, the Forest Service took final agency action when it followed Halmbacher's valuation recommendation and made an offer of exchange to the Partnership. It articulated that offer to the Partnership and gave the Partnership an opportunity to respond. Pursuant to the APA and our circuit's caselaw, the district court did not err in reviewing the agency's actions under the arbitrary and capricious standard.

The Partnership next asserts that because the Forest Service did not act for so

many years, the court should not review the Forest Service's decision under the "arbitrary and capricious" standard of review, but instead should compel the Forest Service to come to a valuation more in line with the Partnership's experts' findings. We first note that it is not clear that the Department and the Forest Service are entirely to blame for the delay in the acquisition of the Partnership's patented mineral interests. In denying the Partnership's Cross Motion for Partial Summary Judgment, the district court noted that "it appears that the primary reason [the Department of Agriculture and the Forest Service] have not yet acquired the patented claims is that [the Partnership] and its predecessor Dan Fer have refused serious negotiations, preferring to condition such negotiations on receipt of unwarranted concessions regarding [unpatented claims previously owned by the Partnership located within the Monument's boundaries]." These facts strongly suggest that both sides may be responsible for the delay in exchanging interests.

■ But even if the Forest Service had unlawfully withheld or unreasonably delayed its decision, § 706(1) of the APA does not empower the district court to conduct a de novo review of the administrative decision and order the agency to reach a particular result. *See INS v. Ventura*, 537 U.S. 12, 16–17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002)(per curiam); *N.L.R.B. v. Food Store Employees Union, Local 347*, 417 U.S. 1, 9–10, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974) (where court overrules agency's exercise of discretionary authority, it should ordinarily remand rather than compel a result); *N.A.A.C.P. v. Sec'y of Hous. and Urban Dev.*, 817 F.2d 149, 160 (1st Cir.1987) (same). Instead, § 706(1) generally only allows the district court to compel an agency to take action, rather than compel a certain result, when action

is unlawfully withheld. *See Firebaugh Canal Co. v. United States*, 203 F.3d 568, 577–78 (9th Cir.2000) (holding that although the court can compel an agency to act, the court cannot specify the outcome the agency should come to); *Silva v. Sec'y of Labor*, 518 F.2d 301, 310–11 (1st Cir. 1975) (declining to order the Secretary to come to a specific result even though past denial of certification was arbitrary and capricious). Because the Forest Service eventually did take final agency action, the district court properly reviewed the Forest Service's decision under the arbitrary and capricious standard of review of § 706(2).

C. *The Forest Service's valuation was not arbitrary and capricious and was in accordance with law.*

■ Under the arbitrary and capricious standard, a reviewing court must determine whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (*quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). This standard is narrow and we may not substitute our judgment for that of the agency. *Id.* Applying the arbitrary and capricious standard, this court must determine whether the agency articulated a rational connection between the facts and the choice made. *Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife*, 273 F.3d 1229, 1236 (9th Cir.2001). This court will overturn an agency's decision only if the agency committed a "clear error of judgment." *California Trout v. Schaefer*, 58 F.3d 469, 473 (9th Cir.1995).

■ The Partnership essentially argues that the Forest Service's action is arbitrary and capricious because it was based

on an inaccurate appraisal. First, the Partnership asserts that the independent appraiser erred in basing the appraisal on the "fair market value" of the Partnership's interests. The property's "fair market value," the Partnership argues, is irrelevant to what the Forest Service should be offering to the Partnership in exchange for its interests because fair market value bears no logical relationship to the "potential value" of the Partnership's mineral interests.

The Partnership's argument necessarily fails. 36 C.F.R. § 254 specifically addresses land exchanges undertaken by the Forest Service. These regulations require the appraisal of the interests the Forest Service is seeking to acquire be based on the interests' "market value." 36 C.F.R. § 254.3(c).

> 36 C.F.R. § 254.3(c) provides:
>
> Except as provided in § 254.11 of this subpart, lands or interest to be exchanged must be of equal value or equalized in accordance with the methods set forth in § 254.12 of this subpart. An exchange of lands or interest shall be based on market value as determined by the Secretary through appraisal(s), through bargaining based on appraisal(s), through other acceptable and commonly recognized methods of determining market value, or through arbitration.

"Market value" is defined as "the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeably, and the price is not affected by undue influence." 36 C.F.R. § 254.2. We decline to rewrite the Monument Act and land exchange regulations by requiring the Department and the Forest Service to exchange land based on the elusive "potential value" of the mineral interests, instead of based on the market value of the mineral interests.

■ The Partnership next argues that the appraiser erred in basing its interests' value as of December 2002, instead of as of August 26, 1983, the date on which the acquisitions were supposed to be completed under the Monument Act. The Partnership makes this argument because, it contends, the value of the property declined as a result of the Monument Act's passage.

Putting aside the fact that the Partnership and its predecessor may have caused some of the delay in the acquisition, neither the Monument Act, nor the regulations addressing land exchanges support the Partnership's interpretation of the Act. First, the Monument Act fails to specify as of what date mineral interests should be appraised for land exchange purposes. By contrast, the Monument Act does establish that any *timber* acquired pursuant to the Act should be valued as of July 1, 1982. Pub.L. No. 97–243, § 3(b). Because the Monument Act established the date on which timber acquired pursuant to the Act should be valued, but failed to establish that mineral interests acquired pursuant to the Act should be valued as of that same date, the most reasonable interpretation of the Act's language is that valuation should be determined from the date of the appraisal. *See Botosan v. Paul McNally Realty,* 216 F.3d 827, 831 (9th Cir.2000) ("Where the statutory language is clear and consistent with the statutory scheme at issue, the plain language of the statute is conclusive and the judicial inquiry is at an end."). Moreover, the regulations addressing land exchanges support this reasoning. Those regulations require an appraisal be of the current market value of the property unless reliable supporting values are not available. 36 C.F.R. § 254.9(b).

We conclude that the Forest Service did not commit a "clear error of judgment" in relying on the independent appraiser's valuation in making its offer. While it is clear that the Partnership is dissatisfied with the independent appraiser's valuation, solely being dissatisfied does not demonstrate the Forest Service's decision was arbitrary and capricious.

D. *The Monument Act permits the Department to exchange mineral interests within the Monument's boundaries for real property of equivalent value outside the Monument's boundaries regardless of whether the Department's property contains mineral deposits.*

■ Lastly, the Partnership argues that the Department may only exchange mineral interests within the Monument for real property outside the Monument that contain mineral deposits. Nothing in the Monument Act, however, requires the Department to make this like kind exchange.

As previously noted, section three of the Monument Act provides:

Section 3. (a) The Secretary shall acquire all lands and interests in lands within the boundaries of the Monument by donation, exchange in accordance with the Act or other provisions of law, or purchase with donated or appropriated funds, except as provided in subsection (c) except that *the Secretary may acquire mineral and geothermal interests only by exchange. . . .*

Pub.L. No. 97–243, 96 Stat. 301 (emphasis added).

The Partnership asserts that when Congress wrote that "the Secretary may acquire mineral and geothermal interests only by exchange," it really meant that "the Secretary may acquire mineral and geothermal interests only by exchanging them for other land containing mineral and geothermal interests." The Partnership's interpretation fails. First, while the wording of the Monument Act does require mineral and geothermal interests to be treated differently than interests in land, it does not require them to be exchanged only for property with mineral and geothermal interests. Indeed, if Congress intended mineral and geothermal interests only to be exchanged for land with mineral and geothermal interests, Congress would have said so. *See Botosan,* 216 F.3d at 831 (9th Cir.2000) ("Statutory interpretation begins with the plain meaning of the statute's language.")

Moreover, the regulations addressing land exchanges do not appear to require that mineral interests be exchanged only for property with mineral interests. The regulations are primarily concerned that an exchange occurs only between "land which are of approximately equal value . . ." 36 C.F.R. § 254.11.

## CONCLUSION

Because the Department of Agriculture and the Forest Service have taken action that is not arbitrary, capricious, or contrary to law, the district court's grant of Appellees' motion for summary judgment is

**AFFIRMED.**