*1166 Opinion by Judge FISHER; Concurrence by Judges KOZINSKI; Dissent by Judge BEA.
FISHER, Circuit Judge,
with whom Chief Judge SCHROEDER and Judges PREGERSON, HAWKINS, W. FLETCHER and RAWLINSON join concurring; Judge KOZINSKI, concurring in the result.
This appeal requires us to consider whether the use of an integration tiebreaker in the open choice, noncompetitive, public high school assignment plan crafted by Seattle School District Number 1 (the “District”) violates the federal Constitution’s Equal Protection Clause. Our review is guided by the principles articulated in the Supreme Court’s recent decisions regarding affirmative action in higher education, Grutter v. Bollinger; 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), and Gratz v. Bollinger, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003), and the Court’s directive that “[cjontext matters when reviewing race-based governmental action under the Equal Protection Clause.” Grutter, 539 U.S. at 327, 123 S.Ct. 2325. We conclude that the District has a compelling interest in securing the educational and social benefits of racial (and ethnic) diversity, and in ameliorating racial isolation or concentration in its high schools by ensuring that its assignments do not simply replicate Seattle’s segregated housing patterns.[1] We also conclude that the District’s Plan is narrowly tailored to meet the District’s compelling interests.
I. Background[2]

A. Seattle Public Schools: A Historical Perspective

Seattle’s historical struggle with the problem of racial isolation in its public school system provides the context for the District’s implementation of the current challenged assignment plan. Seattle is a diverse community. Approximately 70 percent of its residents are white, and 30 percent are nonwhite. Seattle public school enrollment breaks down nearly inversely, with approximately 40 percent white and 60 percent nonwhite students. A majority of the District’s white students live in neighborhoods north of downtown, the historically more affluent part of the city. A majority of the city’s nonwhite students, including approximately 84 percent of all African-American students, 74 percent of all Asian-American students, 65 percent of all Latino students and 51 percent of all Native-American students, live south of downtown.
The District operates 10 four-year public high schools. Four are located north of downtown — -Ballard, Ingraham, Nathan Hale and Roosevelt; five are located south of downtown- — Chief Sealth, Cleveland, Franklin, Garfield and Rainier Beach; one is located west of downtown — West Seattle. For over 40 years, the District has made efforts to attain and maintain desegregated schools and avoid the racial isolation or concentration that would ensue if school assignments replicated Seattle’s segregated housing patterns. Since the 1960s, while courts around the country *1167 ordered intransigent school districts to desegregate, Seattle’s School Board voluntarily explored measures designed to end de facto segregation in the schools and provide all of the District’s students with access to diverse and equal educational opportunities.
In the late 1950s and early 1960s, school assignments were made strictly on the basis of neighborhood.[3] In 1962, Garfield High School reported 64 percent minority enrollment and it accommodated 75 percent of all African-American students. Meanwhile, the eight high schools serving other major areas of the city remained more than 95 percent white.
The District responded to this imbalance, and racial tensions in the de facto segregated schools, in various ways. In the early 1960s, the District first experimented with small-scale exchange programs in which handfulls of students switched high schools for five-week periods. In 1963, expanding on this concept, the District implemented a “Voluntary Racial Transfer” program through which a student could transfer to any school with available space if the transfer would improve the racial balance at the receiving school. In the 1970s, the District increased its efforts again, this time adopting a desegregation plan in the middle schools that requested volunteers to transfer between minority- and majority-dominated neighborhood schools and called for mandatory transfers when the number of volunteers was insufficient, though this portion of the plan was never implemented. The District also took steps to desegregate Garfield High School by changing its educational program, improving its facilities and eliminating “special transfers” that had previously allowed white students to leave Garfield. Finally, for the 1977-78 school year, the District instituted a magnet-school program. According to the District’s history:
While it appeared evident that the addition of magnet programs would not in itself desegregate the Seattle schools, there was supportive evidence that voluntary strategies, magnet and non-magnet, could be significant components of a more comprehensive desegregation plan.
History of Desegregation at 32.
By the 1977-78 school year, segregation had increased: Franklin was 78 percent minority, Rainier Beach 58 percent, Cleveland 76 percent and Garfield 65 percent. Other high schools ranged from 9 percent to 23 percent minority enrollment.
In the spring of 1977, the Seattle branch of the National Association for the Advancement of Colored People (“NAACP”) filed a complaint with the United States Department of Education’s Office of Civil Rights, alleging that Seattle’s School Board had acted to further racial segregation in the city’s schools. Several other organizations, principally the American Civil Liberties Union (“ACLU”), formally threatened to file additional actions if the District failed to adopt a mandatory desegregation plan. When the District agreed to develop such a plan, the Office of Civil Rights concomitantly agreed to delay its investigation, and the ACLU agreed to delay filing a lawsuit.
During the summer of 1977, the District and community representatives reviewed five model plans. Ultimately, the District *1168 incorporated elements of each model into its final desegregation plan, adopted in December 1977 and known as the “Seattle Plan.” The Seattle Plan divided the district into zones, within which majority-dominated elementary schools were paired with minority-dominated elementary schools to achieve desegregation. Mandatory high school assignments were linked to elementary school assignments, although various voluntary transfer options were available. With the Seattle Plan,
Seattle became the first major city to adopt a comprehensive desegregation program voluntarily without a court order. By doing so the District maintained local control over its desegregation plan and was able to adopt and implement a plan which in the eyes of the District best met the needs of Seattle students and the Seattle School District.
History of Desegregation at 36-37. Opponents of the Seattle Plan immediately passed a state initiative to block its implementation, but the Supreme Court ultimately declared the initiative unconstitutional. Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 470, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982).
The Seattle Plan furthered the District’s school desegregation goals, but its operation was unsatisfactory in other ways.[4] In 1988, a decade after its implementation, the District abandoned the Seattle Plan and adopted a new plan that it referred to as “controlled choice.” Under the controlled choice plan, schools were grouped into clusters that met state and district desegregation guidelines, and families were permitted to rank schools within the relevant cluster, increasing the predictability of assignments. Because of Seattle’s housing patterns, the District’s planners explained that “it was impossible to fashion clusters in a geographically contiguous manner”; some cluster schools were near students’ homes, but others were in “racially and culturally different neighborhoods.” Findings and Conclusions at 30-31. Although roughly 70 percent of students received their first choices, the controlled choice plan still resulted in mandatory busing for 16 percent of the District’s students.
In 1994, the Board directed District staff to devise a new plan for all grade levels to simplify assignments, reduce costs and increase community satisfaction, among other things. The guiding factors were to be choice, diversity and predictability. Staff developed four basic options, including the then-existing controlled choice plan, a regional choice plan, a neighborhood assignment plan with a provision for voluntary, integration-positive transfers and an open choice plan.
Board members testified that they considered all the options as they related to the District’s educational goals — with special emphasis, at the secondary school level, on the goals of choice and racial diversity. Neighborhood and regional plans were viewed as unduly limiting student choice, on which the District placed high value because student choice was seen to increase parental involvement in the schools and promote improvements in quality through a marketplace model. The District sought to maintain its commitment to racially integrated education by establishing diversity goals while moving away from the rigid desegregation guidelines and mandatory assignments prevalent in the 1970s and 1980s.
The Board adopted the current open choice plan (the “Plan”) for the 1998-99 *1169 school year. Under the Plan, students entering the ninth grade may select any high school in the District. They are assigned, where possible, to the school they list as their first choice. If too many students choose the same school as their first choice, resulting in “oversubscription,” the District assigns students to each oversubscribed school based on a series of tiebreakers. If a student is not admitted to his or her first choice school as a result of the tiebreakers, the District tries to assign the student to his or her second choice school, and so on. Students not assigned to one of their chosen schools are assigned to the closest school with space available; students who list more choices are less likely to receive one of these “mandatory” assignments. The most recent version of the Plan, which the School Board reviews annually, is for the 2001-02 school year and is the subject of this litigation.

B. The Plan

The District has sought to make each of its 10 high schools unique, with programs that respond to the continually changing needs of students and their parents. Indeed, the District implemented the Plan as part of a comprehensive effort to improve and equalize the attractiveness of all the high schools, including adoption of a weighted funding formula, a facilities plan and a new teacher contract that would make teacher transfers easier. Nevertheless, the high schools vary widely in desirability. Three of the northern schools— Ballard, Nathan Hale and Roosevelt — and two of the southern schools — Garfield and Franklin- — are highly desirable and oversubscribed, meaning that more students wish to attend those schools than capacity allows.[5] The magnitude of the oversub-scription is noteworthy: For the academic year 2000-01, approximately 82 percent of students selected one of the oversubscribed schools as their first choice, while only about 18 percent picked one of the undersubscribed high schools as their first choice. Only when oversubscription occurs does the District become involved in the assignment process.
If a high school is oversubscribed, all students applying for ninth grade are admitted according to a series of four tiebreakers, applied in the following order: First, students who have a sibling attending that school are admitted. In any given oversubscribed school, the sibling tiebreaker accounts for somewhere between 15 to 20 percent of the admissions to the ninth grade class.
Second, if an oversubscribed high school is racially imbalanced — meaning that the racial make up of its student body differs by more than 15 percent from the racial make up of the students of the Seattle public schools as a whole— and if the sibling preference does not bring the oversubscribed high school within plus or minus 15 percent of the District’s demographics, the race-based tie *1170 breaker is “triggered” and the race of the applying student is considered. (For the purposes of the race-based tiebreaker, a student is deemed to be of the race specified in his or her registration materials.) Thus, if a school has more than 75 percent nonwhite students (i.e., more than 15 percent above the overall 60 percent nonwhite student population) and less than 25 percent white students, or when it has less than 45 percent nonwhite students (i.e., more than 15 percent below the overall 60 percent nonwhite student population) and more than 55 percent white students, the school is considered racially imbalanced.
Originally, schools that deviated by more than 10 percent were deemed racially imbalanced. For the 2001-02 school year, however, the triggering number was increased to 15 percent, softening the effect of the tiebreaker.[6] For that year, the race-based tiebreaker was used in assigning entering ninth grade students only to three oversubscribed schools — Ballard, Franklin and Nathan Hale. Accordingly, in seven of the 10 public high schools in 2001-02, race was not relevant in making admissions decisions.
The race-based tiebreaker is applied to both white and nonwhite students. For example, in the 2000-01 school year — when the trigger point was still plus or minus 10 percent — 89 more white students were assigned to Franklin than would have been assigned absent the tiebreaker, 107 more nonwhite students were assigned to Ballard than would have been assigned absent the tiebreaker, 82 more nonwhite students were assigned to Roosevelt than would have been assigned absent the tiebreaker and 27 more nonwhite students were assigned to Nathan Hale than would have been assigned absent the tiebreaker.[7] These assignments accounted for about 10 percent of admissions to Seattle’s high schools as whole. That is, of the approximately 3,000 incoming students entering Seattle high schools in the 2000-01 school year, approximately 300 were assigned to an oversubscribed high school based on the race-based tiebreaker.
In addition to changing the trigger point for the 2001-02 school year to plus or minus 15 percent, the District also developed a “thermostat,” whereby the tiebreaker is applied to the entering ninth grade student population only until it comes within the 15 percent plus or minus variance. Once that point is reached, the District “turns-off” the race-based tiebreaker, and there is no further consideration of a student’s race in the assignment process. The tiebreaker does not apply, and race is not considered, for students entering a high school after the ninth grade (e.g., by transfer).
As demonstrated in the chart below, the District estimates that without the race-based tiebreaker, the nonwhite populations of the 2000-01 ninth grade class at Franklin would have been 79.2 percent, at Hale 30.5 percent, at Ballard 33 percent and at Roosevelt 41.1 percent. Using the race- *1171 based tiebreaker, the actual nonwhite populations of the ninth grade classes at the same schools respectively were 59.5 percent, 40.6 percent, 54.2 percent and 55.3 percent.
2000-01 Difference in Percentages of Nonwhite Students in Ninth Grade with and Without Tiebreaker
Without With Percent School Tiebreaker Tiebreaker Difference
Franklin_792_5915-19.7
Nathan Hale 30.5 40.6 +10.1
Ballard 33.0 54.2 +21.2
Roosevelt 41.1 55.3 +14.2
In the third tiebreaker, students are admitted according to distance from the student’s home to the high school. Distance between home and school is calculated within 1/100 of a mile, with the closest students being admitted first. In any given oversubscribed school, the distance-based tiebreaker accounts for between 70 to 75 percent of admissions to the ninth grade.
In the fourth tiebreaker, a lottery is used to allocate the remaining seats. Because the distance tiebreaker serves to assign nearly all the students in the District, a lottery is virtually never used.

C. Procedural History

Parents Involved in Community Schools (“Parents”), a group of parents whose children were not, or might not be, assigned to the high schools of their choice under the Plan, claimed that the District’s use of the race-based tiebreaker for high school admissions is illegal under the Washington Civil Rights Act (“Initiative 200”),[8] the Equal Protection Clause of the Fourteenth Amendment[9] and Title VI of the Civil Rights Act of 1964.[10]
Both Parents and the District moved for summary judgment on all claims. In a published opinion dated April 6, 2001, the district court upheld the use of the racial tiebreaker under both state and federal law, granting the District’s motion. Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 137 F.Supp.2d 1224, 1240 (W.D.Wash.2001) (“Parents I”). Parents timely appealed, and on April 16, 2002, a three-judge panel of this court issued an opinion reversing the district court’s decision, holding that the Plan violated Washington state law and discussing federal law only as an aid to construing state law. Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 285 F.3d 1236 (9th Cir.2002) (“Parents II”). The panel subsequently withdrew its opinion and certified the state law question to the Washington Supreme Court. Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 294 F.3d 1084, 1085 (9th Cir.2002) (“Parents III”). The Washington Supreme Court disagreed with the panel’s decision, holding that the open choice plan did not violate Washington law. Parents Involved in *1172 Cmty. Schs. v. Seattle Sch. Dist. No. 1, 149 Wash.2d 660, 72 P.3d 151, 166 (2003) (“Parents TV”) (holding that Washington law “does not prohibit the Seattle School District’s open choice plan tie breaker based upon race so long as it remains neutral on race and ethnicity and does not promote a less qualified minority applicant over a more qualified applicant”). Thereafter, a majority of the three-judge panel of this court held that although the District demonstrated a compelling interest in achieving the benefits of racial diversity, the Plan violated the Equal Protection Clause because it was not narrowly tailored. Parents Involved in Comty. Schs. v. Seattle Sch. Dist., No. 1, 377 F.3d 949 (9th Cir.2004) (“Parents V”). We granted en banc rehearing and now affirm the district court.[11]
II. Discussion

A. Strict Scrutiny

We review racial classifications under the strict scrutiny standard, which requires that the policy in question be narrowly tailored to achieve a compelling state interest. See Johnson v. California, - U.S. -, 125 S.Ct. 1141, 1146, 160 L.Ed.2d 949 (2005); Grutter, 539 U.S. at 326, 123 S.Ct. 2325; Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 226-27, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).[12] The strict scrutiny standard is not “strict in theory, but fatal in fact.” Adarand, 515 *1173 U.S. at 237, 115 S.Ct. 2097 (internal quotation marks omitted). “Although all governmental uses of race are subject to strict scrutiny, not all are invalidated by it.” Grutter, 539 U.S. at 326-27, 123 S.Ct. 2325. We employ strict scrutiny to “smoke out” impermissible uses of race by ensuring that the government is pursuing a goal important enough to warrant use of a highly suspect tool. Id. at 327, 123 S.Ct. 2325 (internal quotation marks omitted). This heightened standard of review provides a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decision-maker for the use of race in that particular context. Smith v. Univ. of Washington, 392 F.3d 367, 372 (9th Cir.2004). In evaluating the District’s Plan under strict scrutiny, we also bear in mind the Court’s directive that “[cjontext matters when reviewing race-based governmental action under the Equal Protection Clause.” Grutter, 539 U.S. at 326, 123 S.Ct. 2325.

B. Compelling State Interest

Under strict scrutiny, a government action will not survive unless motivated by a “compelling state interest.” See id. at 325, 327, 123 S.Ct. 2325. Because strict scrutiny requires us to evaluate the “fit” between the government’s means and its ends, Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 280 n. 6, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), it is critical to identify precisely the governmental interests — the ends — to which the government’s use of race must fit. See United States v. Paradise, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (stating that, in order to determine whether an order was narrowly tailored, “we must examine the purposes the order was intended to serve”).
Although the Supreme Court has never decided a case involving the consideration of race in a voluntarily imposed school assignment plan intended to promote racially and ethnically diverse secondary schools, its decisions regarding selective admissions to institutions of higher learning demonstrate that one compelling reason for considering race is to achieve the educational benefits of diversity. The compelling interest that the Court recognized in Grutter was the promotion of the specific educational and societal benefits that flow from diversity. See Grutter, 539 U.S. at 330, 123 S.Ct. 2325 (noting that the law school’s concept of critical mass must be “defined by reference to the educational benefits that diversity is designed to produce”). In evaluating the relevance of diversity to higher education, the Court focused principally on two benefits that a diverse student body provides: (1) the learning advantages of having diverse viewpoints represented in the “robust exchange of ideas” that is critical to the mission of higher education, id. at 329-30, 123 S.Ct. 2325; and (2) the greater societal legitimacy that institutions of higher learning enjoy by cultivating a group of national leaders who are representative of our country’s diversity, id. at 332-33, 123 S.Ct. 2325. The Court also mentioned the role of diversity in challenging stereotypes. Id. at 330, 333, 123 S.Ct. 2325. The Court largely deferred to the law school’s educational judgment not only in determining that diversity would produce these benefits, but also in determining that these benefits were critical to the school’s educational mission. Id. at 328-33, 123 S.Ct. 2325.[13]
*1174 Against this background, we consider the specific interests that the District’s Plan seeks to advance. These interests are articulated in the “Board Statement Reaffirming Diversity Rationale” as:
Diversity in the classroom increases the likelihood that students will discuss racial or ethnic issues and be more likely to socialize with people of different races. Diversity is thus a valuable resource for teaching students to become citizens in a multi-racial/multi-ethnic world.
Providing students the opportunity to attend schools with diverse student enrollment also has inherent educational value from the standpoint of education’s role in a democratic society.... Diversity brings different viewpoints and experiences to classroom discussions and thereby enhances the educational process. It also fosters racial and cultural understanding, which is particularly important in a racially and culturally diverse society such as ours.
The District’s commitment to the diversity of its schools and to the ability to voluntarily avoid racially concentrating enrollment patterns also helps ensure that all students have access to those schools, faculties, course offerings, and resources that will enable them to reach their full potential.
Based on the foregoing rationale, the Seattle School District’s commitment is that no student should be required to attend a racially concentrated school. The District is also committed to providing students with the opportunity to voluntarily choose to attend a school to promote integration. The District provides these opportunities for students to attend a racially and ethnically diverse school, and to assist in the voluntary integration of a school, because it believes that providing a diverse learning environment is educationally beneficial for all students.
The District’s interests fit into two broad categories: (1) the District seeks the affirmative educational and social benefits that flow from racial diversity; and (2) the District seeks to avoid the harms resulting from racially concentrated or isolated schools.

1. Educational and Social Benefits that Flow from Diversity

The District has established that racial diversity produces a number of compelling educational and social benefits in secondary education. First, the District presented expert testimony that in racially diverse schools, “both white and minority students experienced improved critical thinking skills — the ability to both understand and challenge views which are different from their own.”
Second, the District demonstrated the socialization and citizenship advantages of racially diverse schools. School officials, relying on their experience as teachers and administrators, and the District’s expert all explained these benefits on the record. According to the District’s expert, the social science research “clearly and consistently shows that, for both white and minority students, a diverse educational experience results in improvement in race-relations, the reduction of prejudicial attitudes, and the achievement of a more ... *1175 inclusive experience for all citizens .... The research further shows that only a desegregated and diverse school can offer such opportunities and benefits. The research further supports the proposition that these benefits are long lasting.” (Emphasis added.) Even Parents’ expert conceded that “[t]here is general agreement by both experts and the general public that integration is a desirable policy goal mainly for the social benefit of increased information and understanding about the cultural and social differences among various racial and ethnic groups.”[14] That is, diversity encourages students not only to think critically but also democratically.
Third, the District’s expert noted that “research shows that a[ ] desegregated educational experience opens opportunity networks in areas of higher education and employment ... [and] strongly shows that graduates of desegregated high schools are more likely to live in integrated communities than those who do not, and are more likely to have cross-race friendships later in life.” [15]
The District’s interests in the educational and social benefits of diversity are similar to those of a law school as articulated in Grutter. The contextual differences between public high schools and universities, however, make the District’s interests compelling in a similar but also significantly different manner. See Grutter, 539 U.S. at 330, 123 S.Ct. 2325 (noting that the compelling state interest in diversity is judged in relation to the educational benefits that it seeks to produce).
The Supreme Court in Grutter noted the importance of higher education in “preparing students for work and citizenship.” 539 U.S. at 331, 123 S.Ct. 2325. For a number of reasons, public secondary schools have an equal if not more important role in this preparation. First, underlying the history of desegregation in this country is a legal regime that recognizes the principle that public secondary education serves a unique and vital socialization function in our democratic society. As the Court explained in Plyler v. Doe, “[w]e have recognized the public schools as a most vital civic institution for the preservation of a democratic system of government, and as the primary vehicle for transmitting the values on which our society rests.” 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (internal quotation marks and citations omitted); see Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (stating that the inculcation of civic values is “truly the work of the schools”) (internal quotation marks omitted); Plyler, 457 U.S. at 221-23, 102 S.Ct. 2382 (noting that pub- *1176 lie education perpetuates the political system and the economic and social advancement of citizens and that “education has a fundamental role in maintaining the fabric of our society”); Ambach v. Norwick, 441 U.S. 68, 76-77, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (observing that public schools transmit to children “the values on which our society rests,” including “fundamental values necessary to the maintenance of a democratic political system”); Brown v. Bd. of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (“[Education] is required in the performance of our most basic public responsibilities .... It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.”). Under Washington law, such civic training is mandated by the state constitution: “Our constitution is unique in placing paramount value on education for citizenship.” Parents IV, 72 P.3d at 158.
Second, although one hopes that all students who graduate from Seattle’s public schools would have the opportunity to attend institutions of higher learning if they so desire, a substantial number of Seattle’s public high school graduates do not attend college.[16] For these students, their public high school educational experience will be their sole opportunity to reap the benefits of a diverse learning environment. We reject the notion that only those students who leave high school and enter the elite world of higher education should garner the benefits that flow from learning in a diverse classroom. Indeed, it would be a perverse reading of the Equal Protection Clause that would allow a university, educating a relatively small percentage of the population, to use race when choosing its student body but not allow a public school district, educating all children attending its schools, to consider a student’s race in order to ensure that the high schools within the district attain and maintain diverse student bodies.
Third, the public school context involves students who, because they are younger and more impressionable, are more amenable to the benefits of diversity. See Comfort, 418 F.3d at 15-16 (“In fact, there is significant evidence in the record that the benefits of a racially diverse school are more compelling at younger ages.”); Comfort v. Lynn School Committee, 283 F.Supp.2d 328, 356 (D.Mass.2003) (noting expert testimony describing racial stereotyping as a “ ‘habit of mind’ that is difficult to break once it forms” and explaining that “[i]t is more difficult to teach racial tolerance to college-age students; the time to do it is when the students are still young, before they are locked into racialized thinking”); see also Goodwin Liu, Brown, Bollinger, and Beyond, 47 How. L.J. 705, 755 (2004) (“[I]f ‘diminishing the force of [racial] stereotypes’ is a compelling pedagogical interest in elite higher education, it can only be more so in elementary and secondary schools — for the very premise of Grutter’s diversity rationale is that students enter higher education having had too few opportunities in early grades to study and learn alongside peers from other racial groups.”) (citing Grutter, 539 U.S. at 333, 123 S.Ct. 2325) (emphasis added)).
The dissent insists that racial diversity in a public high school is not a compelling interest, arguing that Grutter endorsed a law school’s compelling interest in diversi *1177 ty only in some broader or more holistic sense. Bea, J., dissenting, infra, at 1202. To attain this broader interest, the dissent contends, the District may only consider race along with other attributes such as socioeconomic status, ability to speak multiple languages or extracurricular talents. We read Grutter, however, to recognize that racial diversity, not some proxy for it, is valuable in and of itself. 539 U.S. at 330, 123 S.Ct. 2325 (discussing the “substantial” benefits that flow from a racially diverse student body and citing several sources that detail the impact of racial diversity in the educational environment).
In short, the District has demonstrated that it has a compelling interest in the educational and social benefits of racial diversity similar to those articulated by the Supreme Court in Grutter as well as the additional compelling educational and social benefits of such diversity unique to the public secondary school context.

2. Avoiding the Harms Resulting from Racially Concentrated or Isolated Schools

The District’s interest in achieving the affirmative benefits of a racially diverse educational environment has a flip side: avoiding racially concentrated or isolated schools. In particular, the District is concerned with making the educational benefits of a diverse learning environment available to all its students and ensuring that “no student should be required to attend a racially concentrated school.” See “Board Statement Reaffirming Diversity Rationale,” quoted supra p. 1174. Research regarding desegregation has found that racially concentrated or isolated schools are characterized by much higher levels of poverty, lower average test scores, lower levels of student achievement, with less-qualified teachers and fewer advanced courses — “[w]ith few exceptions, separate schools are still unequal schools.” See Erica Frankenberg et al., A Multiracial Society with Segregated Schools: Are We Losing the Dream? 11 (The Civil Rights Project, Harvard Univ. Jan. 2003), at http://www.civilright spro-ject.harvard.edu /research/ re-seg03/AreWeLosing theDream.pdf) (hereinafter “Civil Rights Project ”) (last visited October 11, 2005) (cited in Grutter, 539 U.S. at 345, 123 S.Ct. 2325 (Ginsburg, J., concurring)).
In Seattle, the threat of having to attend a racially concentrated or isolated school is not a theoretical or imagined problem.[17] As the district court found, the District “established that housing patterns in Seattle continue to be racially concentrated,” and would result in racially concentrated or isolated schools if school assignments were based solely on a student’s neighborhood or proximity to a particular high school. Parents I, 137 F.Supp.2d at 1235. Accordingly, the District’s Plan strives to ensure that patterns of residential segregation are not replicated in the District’s school assignments. Cf. Comfort, 418 F.3d at 29 (“The problem is that in Lynn, as in many other cities, minorities and whites often live in different neighborhoods. Lynn’s aim is to preserve local schools as an option without having the housing pattern of de facto segregation projected into the school system.”) (Boudin, C.J., concurring). Although Parents make much of the fact that “Seattle has never operated a *1178 segregated school system,” and allege that “this is not a school desegregation case,” each court to review the matter has concluded that because of Seattle’s housing patterns, high schools in Seattle would be highly segregated absent race conscious measures. See Parents I, 137 F.Supp.2d at 1237; Parents II, 285 F.3d at 1239-40; Parents III, 294 F.3d at 1088; Parents IV, 72 P.3d at 153.
The district court found that, “[t]he circumstances that gave rise to the court-approved school assignment policies of the 1970s [e.g., Seattle’s segregated housing patterns] continue to be as compelling today as they were in the days of the district’s mandatory busing programs .... [I]t would defy logic for this court to find that the less intrusive programs of today violate the Equal Protection Clause while the more coercive programs of the 1970s did not.” Parents I, 137 F.Supp.2d at 1235. Thus, it concluded that “[p]revent-ing the re-segregation of Seattle’s schools is ... a compelling interest.” Id. at 1237; see id. at 1233-35. Several other courts have also conceived of a school district’s voluntary reduction or prevention of de facto segregation as a compelling interest. See Comfort, 418 F.3d at 14 (holding that the “negative consequences of racial isolation that Lynn seeks to avoid and the benefits of diversity that it hopes to achieve” constituted compelling interests); Brewer v. W. Irondequoit Cent. Sch. Dist., 212 F.3d 738, 752 (2d Cir.2000) (holding that “a compelling interest can be found in a program that has as its object the reduction of racial isolation and what appears to be de facto segregation”), superseded on other grounds as stated in Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 171 n. 7 (2d Cir.2001); Parent Ass’n of Andrew Jackson High Sch. v. Ambach, 738 F.2d 574, 579 (2d Cir.1984) (“[W]e held that the Board’s goal of ensuring the continuation of relatively integrated schools for the maximum number of students, even at the cost of limiting freedom of choice for some minority students, survived strict scrutiny as a matter of law.”) (citing Parent Ass’n of Andrew Jackson High Sch. v. Arnbach, 598 F.2d 705, 717-20 (2d Cir.1979)); McFarland v. Jefferson County Pub. Sch., 330 F.Supp.2d 834, 851 (W.D.Ky.2004) (concluding that voluntary maintenance of the desegregated school system was a compelling state interest and the district could consider race in assigning students to comparable schools), aff’d 416 F.3d 513 (6th Cir.2005).[18] We join these courts in recognizing that school districts have a compelling interest in ameliorating real, identifiable de facto racial segregation.
The dissent, however, contends first that the District is not “desegregating” but rather is engaged in racial balancing. Bea, J., dissenting, infra, at 1197-1198. Further, for the dissent, segregation requires a state actor intentionally to separate the races; and in the absence of such offensive state conduct, the Supreme Court cases detailing the remedies for Fourteenth Amendment violations are of no relevance. Bea, J., dissenting, infra, at 1208, n. 17. Thus, without a court finding of de jure segregation the elected school board members of the District may not take voluntary, affirmative steps towards *1179 creating a racially diverse student body. We disagree. The fact that de jure segregation is particularly offensive to our Constitution does not diminish the real harms of separation of the races by other means. “Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of law....” Brown v. Bd. of Educ., 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (emphasis added). The benefits that flow from integration (or desegregation) exist whether or not a state actor was responsible for the earlier racial isolation. Brown’s statement that “in the field of public education ... [sjeparate educational facilities are inherently unequal” retains its validity today. Id. at 495, 74 S.Ct. 686. The District is entitled to seek the benefits of racial integration and avoid the harms of segregation even in the absence of a court order deeming it a violator of the U.S. Constitution.
Support for this conclusion comes from statements in the Supreme Court’s school desegregation cases, which repeatedly refer to the voluntary integration of schools as sound educational policy within the discretion of local school officials.[19] See Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (stating that school authorities “are traditionally charged with broad power to formulate and implement educational policy and might well conclude ... that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole”); N.C. State Bd. of Educ. v. Swann, 402 U.S. 43, 45, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971) (“[A]s a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitutional requirements.”); Bustop, Inc. v. Bd. of Educ. of Los Angeles, 439 U.S. 1380, 1383, 99 S.Ct. 40, 58 L.Ed.2d 88 (1978) (denying a request to stay implementation of a voluntary desegregation plan and noting that there was “very little doubt” that the Constitution at least permitted its implementation); Keyes v. Sch. Dist. No. 1, 413 U.S. 189, 242, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (Powell, J., concurring in part and dissenting in part) (“School boards would, of course, be free to develop and initiate further plans to promote school desegregation .... Nothing in this opinion is meant to discourage school boards from exceeding minimal constitutional standards in promoting the values of an integrated school experience.”); Washington v. Seattle Sch. Dist. No. 1, 458 U.S. at 480, 487, 102 S.Ct. 3187 (holding unconstitutional the state initiative that blocked the Seattle School District’s use of mandatory busing to remedy de facto segregation).
In sum, we hold that the District’s interests in obtaining the educational and social benefits of racial diversity in secondary education and in avoiding racially concentrated or isolated schools resulting from Seattle’s segregated housing pattern are clearly compelling.

C. Narroio Tailoring

We must next determine whether the District’s use of the race-based tiebreaker is narrowly tailored to achieve its compelling interests. See Grutter, 539 *1180 U.S. at 333, 123 S.Ct. 2325. The narrow tailoring inquiry is intended to “ ‘smoke out’ illegitimate uses of race” by ensuring that the government’s classification is closely fitted to the compelling goals that it seeks to achieve. Richmond v. J.A. Croson Co., 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Here, our analysis is framed by the Court’s narrow tailoring analysis in Grutter and Gratz, which, though informed by considerations specific to the higher education context, substantially guides our inquiry. See Grutter, 539 U.S. at 334, 123 S.Ct. 2325 (stating that the narrow tailoring inquiry is context-specific and must be “calibrated to fit the distinct issues raised” in a given case, taking “relevant differences into account”) (internal quotation marks omitted).
In Gratz, the Court held unconstitutional the University of Michigan’s undergraduate admissions program, which automatically assigned 20 points on the admissions scale to an applicant from an underrepresented racial or ethnic minority group. 539 U.S. at 255, 272, 123 S.Ct. 2411. In Grutter, by contrast, the Court upheld the University of Michigan Law School’s admissions policy, which took race into account as one of several variables in an individual’s application. 539 U.S. at 315-16, 340, 123 S.Ct. 2325. The law school’s policy also attempted to ensure that a “critical mass” of underrepresented minority students would be admitted in order to realize the benefits of a diverse student body.[20] Id. at 316, 123 S.Ct. 2325.
In its analysis, the Court identified five hallmarks of a narrowly tailored affirmative action plan: (1) individualized consideration of applicants; (2) the absence of quotas; (3) serious, good-faith consideration of race-neutral alternatives to the affirmative action program; (4) that no member of any racial group was unduly harmed; and (5) that the program had a sunset provision or some other end point. Smith v. Univ. of Washington, 392 F.3d 367, 373 (9th Cir.2004); Comfort, 418 F.3d at 17 (characterizing Grutter as outlining a “four-part narrow tailoring inquiry”).
Hallmarks two through five are applicable here despite significant differences between the competitive admissions plans at issue in Gratz and Grutter and the District’s high school assignment Plan. The first hallmark, however, is less relevant to our analysis because of the contextual differences between institutions of higher learning and public high schools.

1. Individualized, Holistic Consideration of Applicants

a. An applicant’s qualifications

In the context of university admissions, where applicants compete for a limited number of spaces in a class, the Court in Grutter and Gratz focused its inquiry on the role race may play in judging an applicant’s qualifications. The Court’s underlying concern was that the “admissions policy is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight.” Grutter, 539 U.S. at 337, 123 S.Ct. 2325 (emphasis added) (internal quotation marks omitted); see Adarand, 515 U.S. at 211, 115 S.Ct. 2097 (“The injury in cases of this kind is that a discriminatory classification prevents] the plaintiff from competing on an equal footing.”) (emphasis added) (internal quotation marks omitted). *1181 The focus on fair competition is due, in part, to the stigma that may attach if some individuals are viewed as unable to achieve success without special protection. See Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 298, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J., concurring) (“preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relationship to individual worth”); Croson, 488 U.S. at 493, 109 S.Ct. 706 (“Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility.”).
In Grutter and Gratz, in order to prevent race from being used as a mechanical proxy for an applicant’s qualifications, the Court required individualized, holistic consideration of each applicant across a broad range of factors (of which race may be but one). Grutter, 539 U.S. at 336-37, 123 S.Ct. 2325; see Gratz, 539 U.S. at 272, 123 S.Ct. 2411 (holding that the undergraduate admissions policy was not narrowly tailored because the “automatic distribution of 20 points has the effect of making ‘the factor of race ... decisive ’ for virtually every minimally qualified underrepresented minority applicant”) (emphasis added). This focus on an applicant’s qualifications — whether these qualifications are such things as an applicant’s test scores, grades, artistic or athletic ability, musical talent or life experience — is not applicable when there is no competition or consideration of qualifications at issue.
All of Seattle’s high school students must and will be placed in a Seattle public school.[21] Students’ relative qualifications are irrelevant because regardless of their academic achievement, sports or artistic ability, musical talent or life experience, any student who wants to attend Seattle’s public high schools is entitled to an assignment; no assignment to any of the District’s high schools is tethered to a student’s qualifications. Thus, no stigma results from any particular school assignment.[22] Accordingly, the dangers that are present in the, university context — of substituting racial preference for qualification-based competition — are absent here. See Comfort, 418 F.3d at 18 (“Because transfers under the Lynn Plan are not tied to merit, the Plan’s use of race does not risk imposing stigmatic harm by fueling the stereotype, that ‘certain groups are unable to achieve .success without special protection.’ ”) (quoting Bakke, 438 U.S. at 298, 98 S.Ct. 2733).

b. Differences in compelling interests

The Court’s requirement of individualized, holistic review in Grutter is also more *1182 relevant to the compelling interest advanced by the law school (“the robust exchange of ideas” fostered by viewpoint diversity) than it is to the District’s (racial diversity and avoiding racially concentrated or isolated schools). See Grutter, 539 U.S. at 337, 123 S.Ct. 2325. The Court noted that the law school did not “limit in any way ... the broad range of qualities and experiences that may be considered valuable contributions to student body diversity.” Id. at 338, 123 S.Ct. 2325. To this end, the law school’s policy made clear that “[t]here are many possible bases for diversity admissions, and provide[d] examples of admittees who have lived or traveled widely abroad, are fluent in several languages, have overcome personal adversity and family hardship, have exceptional records of extensive community service, and had successful careers in other fields.” Id. (internal quotation marks and citations omitted). These multiple bases for diversity ensure the “classroom discussion is livelier, more spirited, and simply more enlightening and interesting when the students have the greatest possible variety of backgrounds.” Id. at 330, 123 S.Ct. 2325 (internal citations omitted).
Although the District’s Plan, like the plan in Grutter, is designed to achieve the educational and social benefits of diversity, including bringing “different viewpoints and experiences to classroom discussions,” see “Statement Reaffirming Diversity Rationale,” viewpoint diversity in the law school and high school contexts serves different albeit overlapping ends. In the law school setting, viewpoint diversity fosters the “robust exchange of ideas.” Grutter, 539 U.S. at 324, 123 S.Ct. 2325; see Comfort, 418 F.3d at 16 (“[LJively classroom discussion is a more central form of learning in law schools (which prefer the Socratic method) than in a K-12 setting.”). In the high school context, viewpoint diversity fosters racial and civic understanding.[23] For example, Eric Benson, the principal of Nathan Hale High School, one of the District’s most popular schools, testified that as a result of racial diversity in the classroom, “students of different races and backgrounds tend to have significant interactions both in class, and outside of class. When I came to Nathan Hale, there were racial tensions in the school, reflected in fighting and disciplinary problems. These kind of problems have, to a large extent, disappeared.”
In addition, the law school takes other diversity factors, besides race and ethnicity, into consideration in order to achieve its other compelling interest — cultivating a group of national leaders. For example, extensive travel, fluency in foreign languages, extensive community service and successful careers in other fields demonstrate that a candidate is somehow exceptional or out of the ordinary, cf. Gratz, 539 U.S. at 273, 123 S.Ct. 2411 (disapproving of the undergraduate admissions plan, in part, because of its failure to consider whether an applicant was extraordinary and noting that “[e]ven if [a] student’s] ‘extraordinary artistic talent’ rivaled that of Monet or Picasso, the applicant would receive, at most, five points” as opposed to *1183 the automatic 20 points given to an applicant from an underrepresented minority). In contrast, the District is required to educate all high school age children, both the average and the extraordinary, regardless of individual leadership potential.
The District also has a second compelling interest that is absent from the university context — ensuring that its school assignments do not replicate Seattle’s segregated housing patterns. The holistic review necessary to achieve viewpoint diversity in the university context, across a broad range of factors (of which race may be but one), is not germane to the District’s compelling interest in preventing racial concentration or racial isolation. Because race itself is the relevant consideration when attempting to ameliorate de facto segregation, the District’s tiebreaker must necessarily focus on the race of its students. See Comfort, 418 F.3d at 18 (holding that when racial diversity is the compelling interest — “[t]he only relevant criterion, then, is a student’s race; individualized consideration beyond that is irrelevant to the compelling interest”); Brewer v. W. Irondequoit Cent. Sch. Dist., 212 F.3d at 752 (“If reducing racial isolation is — standing alone — a constitutionally permissible goal, ... then there is no more effective means of achieving that goal than to base decisions on race.”). We therefore conclude that if a noncompetitive, voluntary student assignment plan is otherwise narrowly tailored, a district need not consider each student in a individualized, holistic manner.[24]
The dissent insists that absent such individualized consideration, the District’s plan cannot serve a compelling interest and is not narrowly tailored to protect individuals from group classifications by race. Bea, J., dissenting, infra, at 1209. This is a flawed reading of the Fourteenth Amendment.[25] The District’s compelling interest is to avoid the harms of racial isolation for all students in the Seattle school district. As we have explained, to accomplish that objective the District may look to the racial consequences of honoring the preferred choices of individual students (and their parents). It is true that for some students their first choice of school, based on geographical proximity, will be denied because other students’ choices are granted in order to advance the overall interest in maintaining racially diverse school enrollments. The Fourteenth Amendment in this context does not preclude the District from honoring racial diversity at the expense of geographical proximity. We must not forget that “race unfortunately still matters,” Grutter, 539 U.S. at 333, 123 S.Ct. 2325, and it is race that is the relevant consideration here.
*1184 In sum, the contextual differences between public high schools and selective institutions of higher learning make the first of the Grutter hallmarks ill-suited for our narrow tailoring inquiry.[26] The remaining hallmarks, however, are relevant and control our analysis.

2. Absence of Quotas

In Grutter, the Court approved the law school’s plan, in part, because it did not institute a quota, whereby a fixed number of slots are reserved exclusively for minority groups, thereby insulating members of those groups from competition with other candidates.[27] 539 U.S. at 335, 123 S.Ct. 2325. Although the law school’s plan did not seek to admit a set number or percentage of minority students, during the height of the admission’s season, the law school would consult “daily reports” that kept track of the racial composition of the incoming class. Id. at 318, 123 S.Ct. 2325. The Court held that this attention to numbers did not transform the law school plan into a quota, but instead demonstrated that the law school sought to enroll a critical mass of minority students in order “to realize the educational benefits of a diverse student body.” Id. Similarly, we conclude that the District’s 15 percent plus or minus variance is not a quota because it does not reserve a fixed number of slots for students based on their race, but instead it seeks to enroll a critical mass of white and nonwhite students in its oversubscribed schools in order to realize its compelling interests.[28]

a. No fixed number of slots

The District’s race-based tiebreaker does not set aside a fixed number of slots for nonwhite or white students in any of the District’s schools. The tiebreaker is used only so long as there are members of the underrepresented race in the applicant pool for a particular oversubscribed school. If the number of students of that race who have applied to that school is exhausted, no further action is taken, even if the 15 *1185 percent variance has not been satisfied. That is, if the applicant pool has been exhausted, no students are required or recruited to attend a particular high school in order to bring it within the 15 percent plus or minus range for that year.
Moreover, the number of white and nonwhite students in the high schools is flexible and varies from school to school and from year to year.[29] This variance in the number of nonwhite and white students throughout the District’s high schools is because, under the Plan, assignments are based on students’ and parents’ preferences.[30] The tiebreakers come into play in the assignment process only when a school is oversubscribed. As Morgan Lewis, the Manager of Enrollment Planning, Technical Support and Demographics, testified, “If all the parents ... don’t pick [a] school in a massive number, then everyone gets in. And so it’s ... a case where the choice patterns, the oversubscription ... [is] the reason the [tiebreaker] kicks in .... Everything happens when more people want the seats. And why they want the seats sometimes we don’t know.”

b. Critical mass

Within this flexible system, where parental and student choices drive the assignments to particular schools, the District seeks to enroll and maintain a relatively stable critical mass of white and nonwhite students in each of its oversubscribed high schools in order to achieve its compelling interest in racial diversity and to prevent the assignments from replicating Seattle’s segregated housing patterns. Faced with the question of what constituted a critical mass of students in this particular context, the District determined that a critical mass was best achieved by adopting the 15 percent plus or minus variance tied to demographics of students in the Seattle public schools. Thus, when an oversubscribed high school has more than 75 percent nonwhite students (i.e., more than 15 percent above the overall 60 percent nonwhite student population) and less than 25 percent white students, or when it has less than 45 percent nonwhite students (i.e., more than 15 percent below the overall 60 percent nonwhite student population) and more than 55 percent white students, the school is considered racially concentrated or isolated, meaning that it lacks a critical mass of students needed “to realize the educational benefits of a diverse student body.”
Parents attack the District’s use of the 15 percent plus or minus variance tied to the District’s school population demographics because they believe that the District cannot use race at all in its assignment process. We have rejected this argument, however, applying Grutter and Gratz. See supra Part II.B. Alternatively, Parents contend that the District’s goal of enrolling between 75 and 45 percent non *1186 white students and between 25 and 55 percent white students in its oversubscribed schools establishes a quota, not a critical mass. They note that the critical mass sought by the law school in Grutter was smaller, consisting of between 12 and 20 percent of underrepresented minority students in each law school class.
Parents’ argument, however, ignores Grutter’s admonition that the narrow tailoring inquiry be context-specific. First, like the District’s enrollment goals, which are tied to the demographics of the Seattle schools’ total student population, the law school’s goal of enrolling between 12 to 20 percent of underrepresented minorities in a given year was tied to the demographics of its applicant pool.[31] Second, in tying the use of the tiebreaker to the District’s demographics with a 15 percent plus or minus trigger point, the District adopted a common benchmark in the context of voluntary and court-ordered school desegregation plans. As the District’s expert testified,
Most of the cases I’ve participated in ... generally worked with numbers that reflect the racial composition of the school district but, at the same time, tr[ied] to allow the district sufficient flexibility so that it would not have to regularly and repeatedly move students on a short-term basis simply to maintain some specific number. That’s why we see ranges of plus or minus 15 percent in most cases of school desegregation.
Even Parents’ expert testified that school districts throughout the country determine whether a district is sufficiently desegregated by looking to the “population of the district” in question. See also Comfort, 418 F.3d at 21 (holding that a “transfer policy conditioned on district demographics (+/-10-15%)” was not a quota because it “reflects the defendants’ efforts to obtain the benefits of diversity in a stable learning environment”); Belk v. Charlotte-Mecklenburg Bd. of Educ., 233 F.3d 232, 287-88 (4th Cir.2000) (Traxler, J., dissenting) (citing to a book written by David J. Armor, Parents’ expert, Forced Justice: School Desegregation and the Law 160 (1995), which observed that over 70 percent of the school districts with desegregation plans use a variance of plus or minus 15 percent or greater); cf. 34 C.F.R. § 280.4(b) (defining “minority group isolation” as a “condition in which minority group children constitute more than 50 percent of the enrollment of [a] school”). Given this empirically and time-tested notion of critical mass in the public high school desegregation context, it would make little sense to force the District to utilize the same percentages that constituted a critical mass in the elite law school context to determine what constitutes a critical mass for Seattle public high schools. See Grutter, 539 U.S. at 336, 123 S.Ct. 2325 (“[S]ome attention to numbers, without more, does not transform a flexible admissions system into a rigid quota.”) (internal quotation marks and citations omitted).
Accordingly, we conclude that the District’s 15 percent plus or minus trigger point tied to the demographics of the Seattle school population is not a quota. It is a context-specific, flexible measurement of racial diversity designed to attain and maintain a critical mass of white and nonwhite students in Seattle’s public high schools.

*1187
8. Necessity of the Plan and Race-Neutral Alternatives

Narrow tailoring also requires us to consider the necessity of the race-based plan or policy in question and whether there are equally effective, race-neutral alternatives.

a. Necessity of the Plan

The District argues that the compelling interests that it seeks are directly served by the race-based tiebreaker. The tiebreaker allows the District to balance students’ and parents’ choices among high schools with its broader compelling interests^ — achieving the educational and social benefits of diversity and the benefits specific to the secondary school context, and discouraging a return to enrollment patterns based on Seattle’s racially segregated housing pattern.

i. Need for race-based tiebreaker

When the District moved from its controlled choice plan to the current Plan, see supra Part I.A, it predicted that families would tend to choose schools close to their homes. Indeed, this feature was seen as a positive way to increase parental involvement. However, unfettered choice — especially with tiebreakers based on neighborhood or distance from a school' — created the risk that Seattle’s high school enrollment would again do no more than reflect its segregated housing patterns. See supra Part II.C.2.
It is this de facto residential segregation across a white/nonwhite axis that the District has battled historically and that it seeks to ameliorate by making the integration tiebreaker a part of its open choice Plan.[32] The District, mindful of both Seattle’s history and future, appropriately places its focus here. In the 2001-02 school year, the integration tiebreaker operated in three high schools (that is, three high schools were oversubscribed and deviated by more than 15 percent from the ratio of white to nonwhite students district-wide). The integration tiebreaker served to alter the imbalance in the schools in which it operated in a minimally intrusive manner. The tiebreaker, therefore, successfully achieved the District’s compelling interests.

ii. White/Nonwhite distinction

Parents argue that the District paints with too broad a brush by distinguishing only between white and nonwhite students, without taking into account the diversity within the “nonwhite” group. However, the District’s choice to increase diversity along the white/nonwhite axis is rooted in Seattle’s history and current reality of de facto segregation resulting from Seattle’s segregated housing patterns. The white/nonwhite distinction is narrowly tailored to prioritize movement of students from the north of the city to the south of city and vice versa. This white/nonwhite focus is also consistent with the history of public school desegregation measures throughout the country, as reflected in a current federal regulation defining “[m]i-nority group isolation” as “a condition in which minority group children constitute more than 50 percent of the enrollment of the school,” without distinguishing among the various categories included within the definition of “minority group.” 34 C.F.R. § 280.4(b); see Grutter, 539 U.S. at 316, *1188 123 S.Ct. 2325 (noting that the law school sought to enroll a critical mass of “minority students,” a category that included African Americans, Hispanics and Native Americans); Comfort, 418 F.3d at 22 (“By increasing diversity along the white/nonwhite axis, the Plan reduced racial tensions and produced positive educational benefits. Narrow tailoring does not require that Lynn ensure diversity among every racial and ethnic subgroup as well.”) (emphasis added).

b. Race-neutral alternatives

In Grutter, the Court explained that narrow tailoring “require[s] serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks.” 539 U.S. at 339, 123 S.Ct. 2325 (emphasis added). On the other hand, “[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative.” Id. Furthermore, the Court made clear that the university was not required to adopt race-neutral measures that would have forced it to sacrifice other educational values central to its mission. Id. at 340, 123 S.Ct. 2325. Implicit in the Court’s analysis was a measure of deference toward the university’s identification of those values.[33] See id. at 328, 340, 123 S.Ct. 2325. Here, the record reflects that the District reasonably concluded that a race-neutral alternative would not meet its goals.

i. Using poverty as an alternative measure of diversity

The record demonstrates that the School Board considered using a poverty tiebreaker in place of the race-based tiebreaker. It concluded, however, that this proxy device would not achieve its compelling interest in achieving racial diversity, and had other adverse effects. Although there was no formal study of the proposal by District staff, Board members’ testimony revealed two legitimate reasons why the Board rejected the use of poverty to reach its goal of racial diversity. First, the Board concluded that it is insulting to minorities and often inaccurate to assume that poverty correlates with minority status. Second, for the group of students for whom poverty would correlate with minori *1189 ty status, the implementation would have been thwarted by high school students’ understandable reluctance to reveal their socioeconomic status to their peers.
Because racial diversity is a compelling interest, the District may permissibly seek it if it does so in a narrowly tailored manner. We do not require the District to conceal its compelling interest of achieving racial diversity and avoiding racial concentration or isolation through the use of “some clumsier proxy device” such as poverty. See Comfort, 418 F.3d at 29 (Boudin, C.J., concurring).

ii The Urban League plan

Parents also assert that the District should have more formally considered an Urban League proposal, which did not eliminate the integration tiebreaker but merely considered it after other factors. The Urban League plan was a comprehensive plan seeking to enhance the quality of education in Seattle’s schools by focusing on educational organization, teacher quality, parent-teacher interaction, raising curricular standards, substantially broadening the availability of specialized and magnet programs (which could attract a broader cross-section of students to undersub-scribed schools) and supporting extra-curricular development. The plan proposed decreasing the School District’s reliance on race in the assignment process by pairing neighborhoods with particular schools and creating a type of neighborhood/regional school model. Under the Urban League plan, preference initially would be given to students choosing a school in their paired region, and the existing racial tiebreaker would be demoted from second to third in the process of resolving any remaining oversubscription. The plan also suggested adding an eleventh high school.
Board members testified that they rejected the plan because of the high value the District places on parental and student choice. Moreover, given Seattle’s segregated housing patterns, by prioritizing a neighborhood/regional school model where students are assigned to schools close to their homes, the Urban League plan did not sufficiently ensure the achievement of the District’s compelling interests in racial diversity and avoidance of racial concentration or isolation. As one member of the School Board testified, “[it] would become Controlled Choice all over again. That’s basically what Controlled Choice was, [ ].a regional plan; it controlled your options by using regions or geography.” It was therefore permissible for the District to reject a plan that neither comported with its priorities nor achieved its ■ compelling interests.

in. Lottery

Parents additionally contend in this court that the District should have considered using a lottery to assign students to the oversubscribed high schools. As an initial matter, we note that Parents did not argue before the district court that a lottery was a workable race-neutral alternative that would achieve the Districts’ compelling interests. Parents now argue on appeal, however, that a lottery would achieve the District’s compelling interests without having to resort to the race-based tiebreaker. They ask us to assume that because approximately 82 percent of all students want to attend one of Seattle’s oversubscribed schools, the makeup of this 82 percent, as well as that of the applicant pool for each school, mirrors the demographics of the District (60 percent white and 40 percent nonwhite). Employing this assumption, Parents also ask us to assume that a random lottery drawing from this pool would produce a student body in each of the oversubscribed schools that falls within the District’s 15 percent plus or minus variance. These assumptions, however, are not supported — indeed, are un *1190 dercut — by the factual record. For example, Superintendent Olchefske explained that District patterns indicate that more people choose schools close to home. That would mean that the pool of applicants would be skewed in favor of the demographic of the surrounding residential area. That is, the applicant pool for the north area oversubscribed high schools would have a higher concentration of white students and the applicant pool for the south area oversubscribed high school would have a higher concentration of nonwhite students. Thus, random sampling from such a racially skewed pool would produce a racially skewed student body. As one Board member testified, a lottery was not a viable alternative because “[i]f applicants are overwhelmingly majority and you have a lottery, then your lottery— the pool of your lottery kids are going to be overwhelmingly majority. We have a diversity goal.”
Although the District has the burden of demonstrating that its Plan is narrowly tailored, see Gratz, 539 U.S. at 270, 123 S.Ct. 2411, it need not “exhaust[] every conceivable race-neutral alternative.” Grutter, 539 U.S. at 339, 123 S.Ct. 2325. Parents’ belated and bald assertion that a lottery could achieve the District’s compelling interests, without any evidence to support their claim, fails to demonstrate that a lottery is a viable race-neutral alternative. See id. at 340, 123 S.Ct. 2325 (dismissing the race-neutral alternative of “percentage plans,” advocated by the United States in an amicus brief, because the “United States [did] not ... explain how such plans could work for graduate and professional schools”); Comfort, 418 F.3d at 23 (noting that Lynn rejected the use of a lottery in place of the race-based tiebreaker and holding that “Lynn must keep abreast of possible alternatives as they develop ... but it need not prove the impracticability of every conceivable model for racial integration”) (internal citation omitted).
c. The District’s use of race
The dissent posits variables the District could use instead of race, for example, embracing the San Francisco school district’s approach as a possible model for integration that would meet the dissent’s criteria. Bea, J., dissenting, infra, at 1218, n. 26. Perhaps San Francisco has experienced success (however that school district defines it) in its multi-variable plan — the details and evaluations of which are not in the record. The District is free to consider the San Francisco model when it engages in the annual review of its own Plan. However, even assuming that San Francisco’s plan is working, that does not mean that it must be used by other cities in other states. Much can be gained from the various states employing locally appropriate means to achieve desirable ends. In our system, where states are considered laboratories to be used to experiment with myriad approaches to resolving social problems, we certainly should not punish one school district for not adopting the approach of another. Justice Brandéis said it well,
There must be power in the States and the Nation to remould, through experimentation, our economic practices and institutions to meet changing social and economic needs .... To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.
*1191 New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandéis, J., dissenting).
In sum, the District made a good faith effort to consider feasible race-neutral alternatives and permissibly rejected them in favor of a system involving a sibling preference, a race-based tiebreaker and a proximity preference. Over the long history of the District’s efforts to achieve desegregated schools, it has experimented with many alternatives, including magnet and other special-interest programs, which it continues to employ, and race-conscious districting. But when a racially diverse school system is the goal (or racial concentration or isolation is the problem), there is no more effective means than a consideration of race to achieve the solution. Even Parents’ expert conceded that, “if you don’t consider race, it may not be possible to offer an integrated option to students .... [I]f you want to guarantee it you have to consider race.” As Superintendent Olchefske stated, “when diversity, meaning racial diversity, is part of the educational environment we wanted to create, I think our view was you took that issue head on and used — you used race as part of the structures you developed.” The logic is self-evident: When racial diversity is a principal element of the school district’s compelling interest, then a narrowly tailored plan may explicitly take race into account.[34] Cf. Hunter v. Regents of Univ. of Cal., 190 F.3d 1061, 1067 (9th Cir.1999) (upholding as narrowly tailored the admissions policy of an elementary school — operated as a research laboratory — that explicitly considered race in pursuit of a racially balanced research sample).

I. Undue Harm

A narrowly tailored plan ensures that no member of any racial group is unduly harmed. Grutter, 539 U.S. at 341, 123 S.Ct. 2325. Parents argue that every student who is denied his or her choice of schools because of the integration tiebreaker suffers a constitutionally significant burden. We agree with the Supreme Court of Washington, however, in its assessment that the District’s Plan imposes a minimal burden that is shared equally by all of the District’s students. Parents IV, 72 P.3d at 159-60 (noting that the burden of not being allowed to attend one’s preferred school is shared by all students equally). As that court noted, it is well established that “there [is] no right under Washington law to attend a local school or the school of the student’s choice.” Id. at 159.[35] Indeed, public schools, unlike universities, have a tradition of compulsory assignment. See Bazemore v. Friday, 478 U.S. 385, 408, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (White, J., concurring) (noting that “school boards customarily have the power to create school attendance areas and otherwise designate the school that particular students may attend”). When an applicant’s qualifications are not under consideration at all, there is no notion that one student is entitled to a place at any particular school. See Comfort, 418 F.3d at 20 (“The denial of a transfer under the [District’s] Plan is ... markedly different from the denial of a spot at a unique or selective educational institution.”).
*1192 Moreover, it is undisputed that the race-based tiebreaker does not uniformly benefit one race or group to the detriment of another. At some schools, white students are given preference over nonwhite students, and, at other schools, nonwhite students are given preference over white students. For example, in the 2000-01 school year, 89 more white students were assigned to Franklin, one of Seattle’s most popular schools, than would have been assigned absent the tiebreaker; 107 more nonwhite students were assigned to Ballard, another of Seattle’s most popular schools, than would have been assigned absent the tiebreaker; 27 more nonwhite students were assigned to Nathan Hale than would have been assigned absent the tiebreaker; and 82 more nonwhite students were assigned to Roosevelt than would have been absent the tiebreaker.[36]
In sum, because (1) the District is entitled to assign all students to any of its schools, (2) no student is entitled to attend any specific school and (3) the tiebreaker does not uniformly benefit any race or group of individuals to the detriment of another, the tiebreaker does not unduly harm any students in the District.

5. Sunset Provision

A narrowly tailored plan must be limited not only in scope, but also in time. Grutter, 539 U.S. at 342, 123 S.Ct. 2325. The Court held in Grutter that this dura-tional requirement can be met by “periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity.” Id. The District’s Plan includes such reviews. It revisits the Plan annually and has demonstrated its ability to be responsive to parents’ and students’ choice patterns and to the concerns of its constituents. For example, in 2000, when a higher than normal number of students selected the same schools, the Board responded by increasing the race-based trigger from 10 percent to a 15 percent deviation from the school population, adopting the thermostat that turns off the tiebreaker as soon as the school has come within the 15 percent plus or minus trigger point and by using the tiebreaker solely for the incoming ninth grade class.
With respect to the dissent’s concern for a “logical end point,” Bea, J., dissenting, infra, at 1217, like Justice O’Connor this court shares in the hope that “25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today.” Grutter, 539 U.S. at 343, 123 S.Ct. 2325. We expect that the District will continue to review its Plan, and we presume, as did the Court in Grut-ter, that school officials will demonstrate a good faith commitment to monitoring the continued need for the race-based tiebreaker and terminating its use when that need ends.[37] See 539 U.S. at 343, 123 S.Ct. 2325.
III. Conclusion
For the foregoing reasons, we hold that the Plan adopted by the Seattle School *1193 District for high school assignments is constitutional and the use of the race-based tiebreaker is narrowly tailored to achieve the District’s compelling interests. Accordingly, we AFFIRM the district court’s judgment.
AFFIRMED.

. The terms "racial diversity,” "racial concentration” and "racial isolation” have been used by the District to encompass racial and ethnic diversity, concentration and isolation. For the purposes of this opinion, we adopt this shorthand.

. We draw the following restatement of facts largely from the district court opinion, see Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 137 F.Supp.2d 1224 (W.D.Wash.2001) ("Parents I"), and the Washington Supreme Court Opinion, see Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 149 Wash.2d 660, 72 P.3d 151 (2003) ("Parents IV").

. The history that follows comes principally from two documents in the district court record. One is a report entitled, "The History of Desegregation in Seattle Public Schools, 1954-1981,” which was prepared by the District's desegregation planners. The other is the “Findings and Conclusions” adopted by the Board in support of the current assignment plan. (They are cited as History of Desegregation and Findings and Conclusions, respectively.)

. For example, the Seattle Plan was confusing, required mandatory busing of nonwhite students in disproportionate numbers, made facilities and enrollment planning difficult and contributed to "white flight” from the city schools. Findings and Conclusions at 30.

. The current popularity of Ballard High School is illustrative of the constantly changing dynamic of Seattle's public high schools. In the fall of 1999, Ballard moved to a new facility under the leadership of a new principal. Prior to the move, Ballard was not oversubscribed; now it is one of the most popular high schools in Seattle.
Similarly, the popularity and demographics of Nathan Hale High School changed significantly when it acquired a new principal who instituted a number of academic innovations, including joining the "Coalition of Essential Schools” and instituting a "Ninth Grade Academy” and "Tenth Grade Integrated Studies Program.” Prior to 1998, Nathan Hale, a north area high school, was not oversubscribed, and the student body was predominantly nonwhite. Starting in 1998, the high school began to have a waitlist, and more white students, who had previously passed on Nathan Hale, wanted to go there. As a result, the number of nonwhite students declined dramatically between 1995 and 2000.

. Although the record reflects the general effects of the tiebreaker in 2001-02, it does not include the specific number of students affected by the tiebreaker in the three oversubscribed schools where the tiebreaker applied. The record, however, does include these numbers for the 2000-01 school year. Although the tiebreaker operated differently in 2000-01, and applied to four schools rather than three, the 2000-01 numbers illustrate the general operation of the tiebreaker.

. The Board's decision to change the trigger point for use of the tiebreaker from plus or minus 10 percent to plus or minus 15 percent, however, had the effect of rendering Roosevelt High School neutral for desegregation purposes. Thus, the tiebreaker did not factor into assignments to Roosevelt High School in the 2001-02 school year.

. Wash. Rev.Code § 49.60.400 ("The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.").

. U.S. Const. amend. XIV, § 1 ("No state shall ... deny to any person within its jurisdiction the equal protection of the laws.”).

. 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.”). Because "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI,” we address the twin challenges to the racial tiebreaker simultaneously. Gratz, 539 U.S. at 276 n. 23, 123 S.Ct. 2411.

. We review the district court's resolution of cross-motions for summary judgment de novo. United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir.2003).

. Judge Kozinski's concurrence makes a powerful case for adopting a less stringent standard of review here because the Plan does not attempt to '‘benefit[] or burden[] any particular group;” therefore it “carries none of the baggage the Supreme Court has found objectionable” in earlier equal protection cases. Kozinski, J., concurring, infra at 1194 and 1196. Recognizing the importance of context in the Supreme Court’s equal protection jurisprudence, Judge Kozinski proposes "robust and realistic” rational basis rather than strict scrutiny review. Id. at-. Cf. Coalition for Economic Equity v. Wilson, 122 F.3d 692, 708 n. 16 (9th Cir.1997) (“We have recognized ... that ‘stacked deck’ programs trench on Fourteenth Amendment values in ways that ‘reshuffle’ programs do not. Unlike racial preference programs, school desegregation programs are not inherently invidious, do not work wholly to the benefit of certain members of one group and correspondingly to the harm of certain members of another group, and do not deprive citizens of rights.”) (internal quotation marks, alterations and citations omitted).
Nonetheless, the Supreme Court in Johnson v. California, — U.S. -, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005), rejected the argument that a California Department of Corrections (“CDC”) policy in which all inmates were segregated by race should be subjected to relaxed scrutiny because the policy "neither benefits nor burdens one group or individual more than any other group or individual.” Id. at 1147 (internal quotation marks omitted); see also id. at 1146 (noting that all racial classifications "raise special fears that they are motivated by an invidious purpose” and that "[ajbsent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining ... what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics” (internal quotation marks and citation omitted)). As Judge Ko-zinski aptly notes, Johnson is not entirely analogous to the instant case because the CDC segregated inmates on the basis of race, whereas the District’s use of race is aimed at achieving the opposite result — attaining and maintaining integrated schools. Kozinski, J., concurring, infra, at 1194. Nevertheless, like the First and Sixth Circuits — the only other circuits to rule, post-Grutter and Gratz, on the constitutionality of a voluntary plan designed to achieve the benefits of racial diversity in the public secondary school setting — we conclude that the Plan must be reviewed under strict scrutiny. See Comfort v. Lynn School Committee, 418 F.3d 1, 6 (1st Cir.2005) (en banc); McFarland v. Jefferson County Public Schools, 416 F.3d 513, 514 (6th Cir.2005) (per curiam).

. The Court also heeded the judgment of amici curiae — including educators, business leaders and the military — that the educational benefits that flow from diversity constitute a compelling interest. Grutter, 539 U.S. at 330, 123 S.Ct. 2325 ("The Law School's claim of a compelling interest is further bolstered by its amici, who point to the educational benefits that flow from student body diversity.”); see also id. ("These benefits are not theoretical but real, as major American businesses have *1174 made clear that the skills needed in today’s increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints.”); id. at 331, 123 S.Ct. 2325 ("[H]igh-ranking retired officers and civilian leaders of the United States military assert that, ‘[biased on [their] decades of experience,’ a 'highly qualified, racially diverse officer corps ... is essential to the military’s ability to fulfill its principle mission to provide national security.’ ”).

. Academic research has shown that inter-group contact reduces prejudice and supports the values of citizenship. See Derek Black, Comment, The Case for the New Compelling Government Interest: Improving Educational Outcomes, 80 N.C. L.Rev. 923, 951-52 (2002) (collecting academic research demonstrating that interpersonal interaction in desegregated schools reduces racial prejudice and stereotypes, improving students’ citizenship values and their ability to succeed in a racially diverse society in their adult lives).

. The District's compelling interests in diversity have been endorsed by Congress. In the Magnet Schools Assistance Act, Congress found that "It is in the best interests of the United States — (A) to continue the Federal Government’s support of local educational agencies that are voluntarily seeking to foster meaningful interaction among students of different racial and ethnic backgrounds, beginning at the earliest stages of such students’ education; (B) to ensure that all students have equitable access to a high quality education that will prepare all students to function well in a technologically oriented and a highly competitive economy comprised of people from many different racial and ethnic backgrounds.” 20 U.S.C. § 7231(a)(4) (emphasis added).

. According to the Seattle Times’ School Guide submitted by Parents, for the year 2000, on average 34 percent of Seattle's high school graduates attend four-year colleges after graduation and 38.2 percent attend two-year colleges, although percentages vary from high school to high school.

. The prospect of children across the nation being required to attend racially concentrated or isolated schools is a crisis that school boards, districts, teachers and parents confront daily. See Civil Rights Project 4 ("At the beginning of the twenty-first century, American public schools are now twelve years in the process of continuous resegregation. The desegregation of black students, which increased continuously from the 1950s to the late 1980s, has now receded to levels not seen in three decades.”).

. Like the District, none of the school districts in the above-cited cases was subject to a court-ordered desegregation decree nor, with the exception of Andrew Jackson, did the schools face an imminent threat of litigation to compel desegregation. Like the District, they may have been vulnerable to litigation in decades past, but the districts' voluntary desegregation measures would make it difficult today to make the required showing that the districts intended to create segregated schools. See, e.g., Comfort, 283 F.Supp.2d at 390 (explaining that the district’s vulnerability to litigation had been "headed off by the very Plan in contention here”).

. The dissent correctly notes that these decisions were rendered in the context of de jure segregation. But their import is also significantly compelling in the context of de facto segregation, as in Seattle. Indeed, in Swann, the Court further stated, "Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race. 402 U.S. at 23, 91 S.Ct. 1267 (emphasis added).

. The Court explained that "critical mass” was defined by the law school as "meaningful numbers” or "meaningful representation,” or "a number that encourages underrepresented minority students to participate in the classroom and not feel isolated.” Grutter, 539 U.S. at 318, 123 S.Ct. 2325 (internal quotation marks omitted).

. Parents do not claim that their children have a right to attend a particular school, nor could they. See Bustop Inc., 439 U.S. at 1383, 99 S.Ct. 40 (rejecting any legally protected right to have children attend their nearest school). In any case, under the current Plan, all students can attend a school close to their home. Because there are multiple schools in the north and south of Seattle, students for whom proximity is a priority may elect as their first choice one of the schools in their residential area that is not oversubscribed and be guaranteed an assignment to that school.

. In Bakke, Justice Powell noted:
Respondent's position is wholly dissimilar to that of a pupil bused from his neighborhood school to a comparable school in another neighborhood in compliance with a desegregation decree. Petitioner did not arrange for respondent to attend a different medical school in order to desegregate Davis Medical School; instead, it denied him admission and may have deprived him altogether of a medical education.
438 U.S. at 301 n. 39, 98 S.Ct. 2733.

. The dissent believes that "the educational benefits from diversity, if any, are much greater at the higher educational level because such benefits are greatly magnified by the learning that takes place outside the classroom ...." Bea, J., dissenting, infra, at 1207. This belittles the substantial role of high school classroom discussions in contributing to the educational development of our young citizens. "The [high school] classroom is peculiarly the marketplace of ideas. The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues.” Tinker v. Des Moines Independent Community Sch. Dist., 393 U.S. 503, 512, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (internal quotation marks omitted).

. The dissent calculates that individualized consideration would be administratively feasible because only 300 students would need to be considered holistically. Though it is true that 300 students were subject to the race-based tiebreaker, it does not follow that only those 300 would require individualized consideration. Under the dissent's view of the way the District should operate, all 3,000 students would have to be subject to holistic consideration to determine their proper school assignment. Whether or not this is administratively feasible is not clear in the record, but we believe it is ultimately irrelevant because individualized consideration is not required in the context presented here.

. Reliance on group characteristics is not necessarily constitutionally infirm under Fourteenth Amendment jurisprudence. See, e.g., Kimel v. Florida Bd. of Regents, 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) ("Under the Fourteenth Amendment, a State may rely on age as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interests. The Constitution does not preclude reliance on such generalizations. That age proves to be an inaccurate proxy in any individual case is irrelevant.'')

. The dissent's alternative proposals to achieve the District’s interests in diversity illustrate the difficulty of individualized consideration in the high school context. For example, the dissent offers socioeconomic status as a more narrowly tailored and acceptable form of diversifying the District's schools. However, socioeconomic status does nothing more than substitute a number from a family’s tax return for race. There is no holistic, individualized consideration under such an approach.

. Much like the rationale underlying the Court’s requirement of individualized, holistic review, the rationale underlying the Court’s prohibition of quotas does not apply to the race-based tiebreaker. In paradigmatic affirmative action settings — employment and admissions to institutions of higher learning— the Court disapproves of quotas because they are viewed as insulating minority candidates from competition with nonminority candidates for scarce government resources usually awarded on the basis of an applicant’s qualifications — -jobs, promotions or places in a law school class. See Bakke, 438 U.S. at 317, 98 S.Ct. 2733 (opinion of Powell, J.). This is objectionable because no "matter how strong their qualifications,” nonminority candidates are never afforded the chance to compete with applicants from the preferred groups for the set-aside. Id. at 319, 98 S.Ct. 2733. Because noncompetitive assignment to Seattle’s public high schools is not based on a student’s relative qualifications, the dangers that are presented by a quota — of substituting racial preference for qualification-based competition — are absent here.

.Although the dissent contends that the "tiebreaker aims for a rigid, predetermined ratio of white and nonwhite students,” we believe it is more appropriately viewed as a "permissible goal.” Such a goal "requires only a good faith effort ... to come within a range demarcated by the goal itself.” Grutter, 539 U.S at 334, 123 S.Ct. 2325 (internal quotation marks and citation omitted). The tiebreaker's broad, 30% range and the District's willingness to turn off the use of the tiebreaker after the ninth grade are consistent with a goal as opposed to a rigid ratio.

. Notably, the District's percentage of white and nonwhite enrollment is significantly more varied than the percentage of underrepresented minorities admitted to the University of Michigan’s Law School, which remained relatively consistent. From 1995 to 1998, the percentage of minority students enrolled in the law school was 13.5 percent, 13.8 percent, 13.6 percent and 13.8 percent. Grutter, 539 U.S. at 389-90, 123 S.Ct. 2325 (Kennedy, J„ dissenting). In contrast, the District’s percentage of white and nonwhite enrollment encompasses a wide range. For example, for the 2000-01 school year, the percentage of nonwhite students in the ninth grade classes of the four oversubscribed public high schools after the racial tiebreaker was applied, varied from 54.2 percent at Ballard, to 59.5 percent at Franklin, to 40.6 percent at Nathan Hale to 55.3 percent at Roosevelt.

. Slightly more than 80 percent of all entering ninth grade students were assigned to their first choice school.

. For example, in 1995, 662 (approximately 16 percent) of the 4147 law school applicants were underrepresented minorities; in 1996, 559 (approximately 15 percent) of the 3677 law school applicants were underrepresented minorities; in 1997, 520 (approximately 15 percent) of the 3429 law school applicants were underrepresented minorities. See Grutter, 539 U.S. at 384, 123 S.Ct. 2325 (Rehnquist, C.J., dissenting).

. Although we characterize it as de facto residential segregation, we are mindful of Justice Marshall’s dissent in Board of Education v. Dowell, “The ... conclusion that the racial identity of the northeast quadrant now subsists because of 'personal preference[s]’ pays insufficient attention to the roles of the State, local officials, and the Board in creating what are now self-perpetuating patterns of residential segregation.” 498 U.S. 237, 263, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (internal citation omitted).

. The Supreme Court repeatedly has shown deference to school officials at the intersection between constitutional protections and educational policy. See generally Wendy Parker, Connecting the Dots: Grutter, School Desegregation, and Federalism, 45 Wm. & Mary L.Rev. 1691 (2004). The theme of local control over public education has animated Supreme Court jurisprudence. See, e.g., Brown, 349 U.S. at 299, 75 S.Ct. 753 (directing local school officials, with court oversight, to devise remedies for segregation in the light of "varied local school problems”); Milliken v. Bradley, 418 U.S. 717, 741-42, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process.”); Freeman, 503 U.S. at 490, 112 S.Ct. 1430 ("As we have long observed, 'local autonomy of school districts is a vital national tradition.’ ” (quoting Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977))); see also Bethel Sch. Dist. v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) ("The determination of what manner of speech in the classroom or in the school assembly is inappropriate properly rests with the school board.”); LaVine v. Blaine School District, 257 F.3d 981, 988 (9th Cir.2001) ("In the school context, we have granted educators substantial deference as to what speech is appropriate.”) (citing and quoting Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988)). These Supreme Court decisions suggest that secondary schools occupy a unique position in our constitutional tradition. For this reason, we afford deference to the District’s judgment similar to that which Grutter afforded the university. See Grutter, 539 U.S. at 328-29, 123 S.Ct. 2325.

. The dissent urges, “The way to end discrimination is to stop discriminating by race.” Bea, J., dissenting, infra, at 1221. More properly stated, the way to end segregation is to stop separation of the races. The Seattle school district is attempting to do precisely that.

. Subject to federal statutory and constitutional requirements, structuring public education has long been within the control of the states as part of their traditional police powers. See Barbier v. Connolly, 113 U.S. 27, 31-32, 5 S.Ct. 357, 28 L.Ed. 923 (1884) (describing the states' traditional police powers).

. As detailed earlier, the Board’s decision to change the trigger point for use of the tiebreaker from plus or minus 10 percent to plus or minus 15 percent had the effect of rendering Roosevelt High School neutral for desegregation purposes. Thus, the tiebreaker did not factor into assignments to Roosevelt High School in the 2001-02 school year.

. It is worth noting that plans like the District’s may actually contribute to achieving the Court's vision in Grutter that racial preferences will no longer be necessary in 25 years — or even sooner. As Justice Ginsburg observed, “As lower school education in minority communities improves, an increase in the number of [highly qualified and competitive] students may be anticipated.’’ Grutter, 539 U.S. at 346, 123 S.Ct. 2325 (Ginsburg, J., concurring).